**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SEAN FLYNN, DEAN KARLAN, and JONATHAN MORDUCH, individually and on behalf of all others similarly situated,<br><br>               Plaintiffs,<br><br>     v.<br><br>MCGRAW HILL LLC,<br><br>               Defendant. | Civ. No.<br><br><u>CLASS ACTION</u> |

**CLASS ACTION COMPLAINT**

Sean Flynn, Dean Karlan, and Jonathan Morduch (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, by their undersigned attorneys, bring this action against Defendant McGraw Hill LLC ("McGraw Hill" or the "Company"). With knowledge of their own acts and acts occurring in their presence, and upon information and belief as to all other matters, Plaintiffs allege the following:

## I.   SUMMARY OF THE ACTION

1.      This is a federal class action that asserts claims for breach of contract against McGraw Hill, an educational publishing company. Plaintiffs bring this action on behalf of a Class, as defined below, of authors who have contracted with McGraw Hill (or one of its predecessors-in-interest or affiliates) for McGraw Hill to publish, sell and distribute their works, pursuant to publishing agreements that provide for the payment of royalties on the sale of their works.

2.      This case arises out of McGraw Hill's breach of its contracts with authors by its unilateral action in reducing the royalties it pays to authors when it sells their textbooks, works, or parts thereof, in an electronic format.

3.      As a textbook publisher, McGraw Hill provides a platform to authors for the distribution of their works. For much of the Company's history, McGraw Hill published textbooks on a print platform with paper and ink.

4.      As more and more students and educational institutions have come to prefer electronic platforms over paper, royalties on sales of electronic textbooks have in recent years become a crucial component of the overall income of the authors of those books. The majority of authors of textbooks sold by McGraw Hill are academics who supplement their incomes from their educational institute affiliates with royalties from their works.

5.      In 2009, McGraw Hill launched an online platform called "Connect," which McGraw Hill used to distribute online textbooks.  Connect is in essence a replacement for paper versions of books.

6.      Since the inception of Connect, and in accordance with its contracts with authors, McGraw Hill paid authors royalties on the entire sale price of textbooks sold as a single unit with access to the Connect platform.  The electronic textbooks are necessary to the Connect platform because they form the basis of the corresponding ancillary materials built around them.

7.      Despite the longstanding practice of paying royalties on the entirety of revenues received from textbooks sold on the Connect platform, and in direct contravention of the terms of McGraw Hill's contracts with its authors, recently McGraw Hill unilaterally decided that it would only pay the contractually required royalties on what it now claims is the "textbook" portion of the sales price.   Thus, McGraw Hill decided not to  pay royalties on what it asserts is the "Connect access" portion of the textbook sales and will only pay a reduced royalty on what it says is the "online course material" portion of the sales.

8.      This maneuver amounts to a bald attempt by McGraw Hill to pass its Connect-related costs to authors, in direct contravention of its contracts, which state that McGraw Hill will publish the authors' works "at its own expense."  This is equivalent to reducing royalties for sales of paper textbooks based on McGraw Hill's costs of printing those books, which would violate the explicit terms of the contracts.

9.      McGraw Hill's action also contravenes its course of performance over the last decade, which has reflected McGraw Hill's understanding that royalties must be paid on the entirety of revenues received from the sale of online textbooks on the Connect platform.

10.     Separately, the change constitutes a breach of McGraw Hill's duty of good faith and fair dealing.  By artificially redefining the "price" of authors' works as only a fraction of the revenues McGraw Hill receives for the sale of those works, McGraw Hill has reduced the amounts on which royalty payments are due.  In so doing, McGraw Hill has deprived authors of the benefit of their bargains with the Company.

11.     Although the precise effect of McGraw Hill's unilateral action varies for each affected author, the change will cause an estimated 25% to 35% reduction in royalties paid to authors on the sales of textbooks sold for use on Connect—a significant blow to the academics who rely on those royalty payments to supplement their incomes.

12.     This action seeks damages from McGraw Hill on behalf of a Class of authors, as defined below, who have contracted with McGraw Hill, and who have been harmed by its unilateral reduction in royalty payments.  This action further seeks injunctive relief preventing McGraw Hill from changing how it pays royalties on online textbook sales in the absence of revised agreements with authors, and a declaratory judgment that McGraw Hill's change violates authors' contracts with the Company.

## II.    THE PARTIES

13.     Plaintiff Sean Flynn is a resident of Nevada.  Professor Flynn is a textbook author who entered into a Royalty Contract, as defined below in paragraph 27, with McGraw Hill.  Professor Flynn is an Associate Professor of Economics at Scripps College, and is a co-author of the book "*Economics: Principles, Problems, and Policies*," which is published by McGraw Hill.  This textbook was first published in 1960 and is currently in its twenty-second edition.  As described herein, Professor Flynn was harmed when McGraw breached its contract with Professor Flynn by reducing the royalty payments he receives on online sales of his book.

14. Plaintiff Dean Karlan is a resident of Illinois. Professor Karlan is a textbook author who entered into a Royalty Contract, as defined below, with McGraw Hill. Professor Karlan is a Professor of Economics and Finance, Kellogg School of Management, Northwestern University, and is a co-author of the book "*Economics*" and its single-semester split works "*Microeconomics*" and "*Macroeconomics*," which are published by McGraw Hill. *Economics* and its split works were first published in 2013 and are currently in their third edition. As described herein, Professor Karlan was harmed when McGraw breached its contract with Professor Karlan by reducing the royalty payments he receives on online sales of his books.

15. Plaintiff Jonathan Morduch is a resident of New Jersey. Professor Morduch is a textbook author who entered into a Royalty Contract, as defined below, with McGraw Hill. Professor Morduch is a Professor of Public Policy and Economics at the Wagner Graduate School of Public Service at New York University, and is a co-author of the book "*Economics*" and its single-semester split works "*Microeconomics*" and "*Macroeconomics*," which are published by McGraw Hill. As described herein, Professor Morduch was harmed when McGraw breached its contract with Professor Morduch by reducing the royalty payments he receives on online sales of his books.

16. Defendant McGraw Hill LLC is a Delaware limited liability company with its headquarters located at 1325 Avenue of the Americas, 6th Floor, New York, New York 10019. McGraw Hill LLC is the successor-in-interest to certain entities that were parties to the contracts entered into by the Class members.

### III.   JURISDICTION AND VENUE

17. This Court has jurisdiction over the claims alleged herein pursuant to 28 U.S.C. § 1332(d).

18.     This action is brought on behalf of a class of authors who reside primarily outside the State of New York, and at least one member of the Class is a citizen of a State other than New York.

19.     The amount in controversy in this action exceeds $5,000,000, exclusive of interest and costs.

20.     Venue lies within this district under 18 U.S.C. § 1965 and 28 U.S.C. § 1391. McGraw Hill maintains its headquarters in New York, New York, and conducts a substantial amount of business in this district, including contracting with members of the Class, and selling and distributing works of the Class members.

21.     Many of the relevant contracts described herein, which give rise to the Class members' claims against McGraw Hill, select New York law under their choice-of-law provisions.

## IV.   FACTS

### A.     McGraw Hill and the Royalty Contracts

22.     McGraw Hill was founded in 1888 and has grown to be one of the largest educational publishing companies in the country.  The Company boasts that it partners with more than 14,000 authors and educators in various fields of study, including more than 50 Nobel laureates.  The Company also distributes content in more than 100 countries.  McGraw Hill is owned by the private equity firm Apollo Global Management, LLC, which acquired the Company in March 2013.

23.     McGraw Hill offers educational products for students at all levels, from pre-kindergarten through higher education.  According to McGraw Hill, students of approximately 250,000 higher-education instructors and 13,000 grade school districts use its products.  In 2019, McGraw Hill and its affiliates reported total revenue of more than $1.5 billion.

24.     A core part of McGraw Hill's business is publishing educational textbooks.  As a textbook publisher, McGraw Hill provides a platform to academics and other authors for the distribution of their works.

25.     For much of its history, McGraw Hill focused on a print-centric platform for educational textbooks and instructional materials, which it sold directly and through retailers such as on-campus bookstores. Although in most cases, students purchase the textbooks, it is schools and teachers who more commonly choose the textbooks that students are then required to purchase.

26.     Higher-education textbooks traditionally have been lucrative to publishers. According to a report published by McKinsey & Co. in 2014, college students typically spent between $500 and $1,500 annually on course materials, translating to a nearly $10 billion industry. The industry is dominated by only a handful of publishers, including McGraw Hill.

27.     McGraw Hill's business model is premised on entering into publishing agreements with academic authors, pursuant to which (1) the author agrees to produce an academic textbook and transfer the related copyrights to McGraw Hill; (2) McGraw Hill agrees to publish and sell the textbook; and (3) the author earns a per-sale percentage royalty on the sales of the work (each such agreement a "Royalty Contract").

28.     The authors whose textbooks McGraw Hill publishes come from a variety of academic institutions, ranging from the most selective and elite universities to local community colleges.

29.     The textbooks also vary widely in their total sales.  While some books have sales in the millions of dollars each year, many books have sales only in the thousands of dollars.

30.     Regardless of sales volume, the royalty payments on sales of their works constitute an important part of authors' income.  This is especially so for academics whose salaries are

relatively modest, and who therefore rely on royalty payments from McGraw Hill to supplement their incomes.

31.     The Royalty Contracts are substantially similar in all relevant respects.  They govern the terms of the authors' performances and McGraw Hill's payments to the authors for sales of their "Works," which, as discussed below, is a defined term in the Royalty Contracts.

### B.     The Relevant Royalty Contract Provisions

32.     On May 2, 2006, Professor Flynn entered into a Royalty Contract with "The McGraw-Hill Companies, Inc.," which is a McGraw Hill predecessor.  Pursuant to that Royalty Contract, Professor Flynn was made a party to an earlier May 22, 1989 agreement between  (i) the co-authors of the prior editions of his book—Campbell R. McConnell and Stanley R. Brue—and (ii) another McGraw Hill predecessor, McGraw-Hill, Inc.  Thus, under Professor Flynn's Royalty Contract, the terms of the original 1989 agreement and its subsequent amendments govern Professor Flynn's agreement with McGraw Hill to this date.

33.     The original 1989 agreement that Professor Flynn later joined follows a standard form used at the time by McGraw-Hill, Inc.

34.     Section 1 of Professor Flynn's Royalty Contract defines the "Work" and requires the author to furnish a manuscript of that Work.  Specifically:

> [The Author] shall prepare and deliver to [McGraw Hill] a manuscript for a work entitled ECONOMICS: Principles, Problems, and Policies, 11th Edition (the "Work") or such other title as may be mutually agreeable to the Publisher and the Author, and the Publisher shall publish the Work, in accordance with and subject to the provisions of this Agreement dated May 22, 1989.

35.     Section 6 of Professor Flynn's Royalty Contract, in relevant part, requires McGraw Hill to publish the Work at its own expense:

> After giving written notice to the Author that it has accepted the Work as being in form and content satisfactory for publication, *the*

> **Publisher shall publish the Work at its own expense** at such time and in such style and manner and with such trademarks, service marks, and imprints of the Publisher, and sell the Work at such prices, as it shall deem suitable. [Emphasis added.]

36.     Section 7 of Professor Flynn's Royalty Contract specifies the size of the royalty payments due on different types of sales of the authors' Work.  Such royalty payments are expressed as a percentage of the sales of the Work, and there are different percentages for different categories of sales.  Section 7(a)(1) is the relevant provision here, and sets forth the royalties due for domestic sales, expressed as a percentage of net receipts (as used herein, the "Royalty Percentage"):

> As full payment to the Author, the Publisher shall pay to the Author . . . [a] percentage of the **Publisher's net receipts** for each copy of the Work sold by the Publisher for use within the United States (except as otherwise provided in this Section 7), as follows: 18.75 percent on all copies[.]  The number of copies sold that determines the royalty percentage payable on sales for use within the United States shall include all domestic and foreign sales made by the Publisher.  This schedule of royalty percentages shall apply separately to each edition of the Work. [Emphasis added.]

37.     Section 7(c) of Professor Flynn's Royalty Contract defines "net receipts":

> The term "Publisher's net receipts" shall mean the Publisher's **selling price**, less discounts, credits, and returns, or a reasonable reserve for returns. [Emphasis added.]

38.     Section 11 of Professor Flynn's Royalty Contract provides that New York law governs the Contract:

> This Agreement shall in all respects be interpreted and construed in accordance with and governed by the laws of the State of New York, regardless of the place of its execution or performance.

39.     In or around 2006, McGraw Hill amended older Royalty Contracts to include a new provision making clear that the domestic royalty rate also applies to electronic sales of the Works.  Thus, Section 7(a)(6) of Professor Flynn's Royalty Contract was amended on May 11, 2006 to

state that the "Royalty for electronic rights to the Work is the same as the domestic royalty rate: 18.75%."

40.     On November 12, 2008, Professors Karlan and Morduch entered into a Royalty Contract with The McGraw-Hill Companies, Inc., a McGraw Hill predecessor.

41.     Section 1 of Professor Karlan and Professor Morduch's Royalty Contract defines the "Work" and requires the author to furnish a manuscript of the Work:

> The Author agrees to prepare for publication a work tentatively titled *Principles of Economics*, which includes the two-semester *Principles of Economics* work and the one-semester split versions of the work, tentatively titled *Principles of Microeconomics* and *Principles of Macroeconomics*, respectively, and both collectively, known as the "Work."

42.     Under Section 10(A) of Professor Karlan and Professor Morduch's Royalty Contract, McGraw Hill agrees to publish the Work at its own expense:

> After the Publisher's acceptance of the complete, final revised manuscript, ***the Publisher will publish the Work in book and/or electronic form at its own expense***. All decisions as to style of printing, paper and binding, trademark, logo or imprint, single or multiple volume format, design and programming of electronic editions, selection of title and cover, price(s) and all other matters involving terms of sale, distribution, advertising, promotion, appearance, design and format of the Work will be made by the Publisher in its sole discretion; provided the Publisher shall consult with the Author regarding the sales price, title, authorship credit, jacket design, use of the Author's name and likenesses in the Work and in marketing materials. [Emphasis added.]

43.     Section 3 of Professor Karlan and Professor Morduch's Royalty Contract sets forth the royalties due on sales of the Work:

> The Publisher will pay the Author a royalty of 17% of the ***Publisher's net receipts*** from the sale of all print, custom and electronic editions of the "Work", except as otherwise provided in this Agreement. [Emphasis added.]

44.    Section 12(D)(i) of Professor Karlan and Professor Morduch's Royalty Contract

defines "net receipts" as follows:

> "Net receipts" from the Work means the Publisher's **selling price**
> from each copy of **any edition or version** of the Work sold or
> licensed by the Publisher, after any discounts, rebates and amounts
> credited for returns, and less a reasonable reserve for future returns,
> and shall not include shipping or handling charges or sales, excise,
> value added or similar taxes, if any. [Emphasis added.]

45.    Section 20(A) of Professor Karlan and Professor Morduch's Royalty Contract

provides that New York law governs the Contract:

> This Agreement will be interpreted, enforced and construed in
> accordance with and governed by the laws of the State of New York,
> regardless of the place of its execution or performance and without
> regard to rules regarding the conflict of laws.  The parties agree that
> any disputes arising out of or related to this Agreement will be
> brought only in the state or federal courts with jurisdiction in New
> York County, New York, and the parties expressly consent to the
> exclusive jurisdiction of such courts for such purposes.

46.    As these contracts illustrate, the McGraw Hill  Royalty Contracts with textbook

authors share the same key provisions:

- The author delivers a manuscript of the Work, which McGraw Hill must
publish at its own expense.

- Royalties are paid as a percentage of the publisher's "net receipts" from the
sale of the Work, in print and electronic editions.

- "Net receipts" is defined as the "selling price" less certain items that *do not*
include the costs of publishing.

47.    Without any alteration to the terms above, certain Royalty Contracts contemplate

multiple authors, in which case the Contracts delineate how royalties are to be allocated among

the authors.

48.    The key terms of McGraw Hill's Royalty Contracts are substantively the same for

each Class member, although each contract sets forth a different Royalty Percentage due on the

sales of the author's Works.  Thus, for instance, one author might be paid a royalty of 15% of McGraw Hill's net receipts on sales, while another author might be paid 12%.

**C.      McGraw Hill Launches Electronic "Connect" Platform**

49.      In recent years, students and instructors increasingly have turned to digital textbook platforms, rather than the traditional printed textbooks and supplements.

50.      In response to this trend, in 2009, McGraw Hill launched its online "Connect" platform, which McGraw Hill touts on its website as a "course management and adaptive learning solution that enhances [the user's] unique voice and teaching style."  After the launch, certain authors—at McGraw Hill's request—promoted Connect when engaged in sales activities.

51.      Digital content has become an increasingly important facet of McGraw Hill's business.  By 2016, McGraw Hill's sales of digital units surpassed print sales.  In McGraw Hill's fiscal 2020, there were 4.3 million paid activations for the Connect platform, a 9% increase from the prior year.  Approximately 53% of McGraw Hill's billings now come from digital products.

52.      The Connect platform is a single online location where teachers and students can access electronic textbooks and course materials, complete assignments and track performance. The electronic textbooks, or "ebooks," are delivered through the "SmartBook" component of Connect, which, among other things, allows the books to be viewed online and includes certain course materials.

53.      The online course materials typically include guides, presentations, question and answer banks, as well as other aides, and commonly draw directly from the associated textbooks. The textbook authors themselves have a significant role in developing those materials.

54.      Textbooks are the necessary component of the Connect platform.  Not only do educators and students continue to seek high-quality textbooks for their courses, but the books also form the basis of the courses built around them.  Simply put, if the authors did not produce the

textbooks, McGraw Hill would not be able to market Connect: it would be an empty, useless platform.  All of the other purposes or applications available on Connect require a textbook; without the textbook, the other applications of the platform are meaningless.

55.     Following the launch of Connect, McGraw Hill began selling electronic copies of textbooks and accompanying course materials for use on the Connect platform, and sold those materials as a unit for a single, unitary price.

56.     Accordingly, for sales of electronic textbooks on the Connect platform, McGraw Hill began paying the Royalty Percentage to authors based on "net receipts" from sales of Connect-platform textbooks, which were calculated by multiplying the sales "price" of the textbooks by the number of units sold.  Thus, if 100 students purchased Professor Flynn's Connect-platform textbook, the royalty due to him and his co-authors would be 18.75% of the amount represented by 100 times the selling price of the book, less deductions for discounts, credits, and returns.

57.     This method of calculating royalties due authors for sales of their textbooks on Connect had been followed without deviation since Connect's inception in 2009.  It did not matter which iteration of the Royalty Contract was in place; McGraw Hill uniformly paid its authors a royalty based on the total net receipts for the Connect-platform textbooks.  Professors Flynn, Karlan, and Morduch were receiving royalties in this fashion.

### D.     McGraw Hill Unilaterally Reduces Payments to Authors

58.     Despite its established and longstanding practice of paying the Royalty Percentage on the entire net receipts of textbooks on the Connect platform, in or about November 2020, McGraw Hill changed how it calculates and pays royalties on Connect textbook sales.

59.     For example, in an email from  McGraw Hill to Professor Flynn on November 23, 2020, McGraw Hill stated that, effective with the current royalty period,

> [T]he royalty for sales of the ebook within the Connect product will be paid on the revenue attributed to the ebook component, determined proportionally based on the stand-alone list price of the ebook of corresponding duration to the Connect product divided by the list price of the Connect product. In addition, a permissions fee attributed to the [course materials] component will be paid for the re-use of the ebook content in McGraw Hill's SmartBook technology and other tools within the same Connect product. The revenue attributed to the [course materials] component will be any revenue not attributed proportionally to the ebook or platform components.

60.     In other words, under this new royalty scheme, McGraw Hill will pay the Royalty Percentage only on "revenue attributed to the ebook component"—a term nowhere defined or even mentioned in its Royalty Contracts.  Thus, McGraw Hill has unilaterally amended the contract terms without the permission or agreement of the authors.

61.     In essence, for the first time in over eleven years, McGraw Hill will be discounting royalty payments by reducing its Connect-related overhead from the net receipts on which it pays the Royalty Percentage.

62.     Indeed, the change allows McGraw Hill to recoup its Connect-related costs by diverting royalty income from authors to itself.

63.     This unprecedented reduction constitutes a breach of contract in three ways.  ***First***, it violates the explicit terms of the Royalty Contracts by introducing new terms not present in the Royalty Contracts.  McGraw Hill will now pay royalties based on the "revenue attributed to the ebook component," which is found nowhere in the Royalty Contracts.  Rather, the Royalty Contracts require McGraw Hill to pay royalties based on the "net receipts" of sales, which is defined as the "selling price" less certain items.

64.     ***Second***, the reduction violates the explicit terms of the Royalty Contracts which prevent McGraw Hill from passing its publication costs to authors.  Two provisions are relevant: the requirement that McGraw Hill publish each Work "at its own expense," and the definition of

"net receipts" on which royalties are paid.  By requiring McGraw Hill to publish each work "at its own expense," the Royalty Contracts expressly require McGraw Hill to absorb the costs of publication.  Similarly, the definition of "net receipts" sets forth an express list of certain items that may be deducted from the "selling price," such as discounts, rebates, and credits.  Publication costs are not among the items listed that may be deducted in calculating net receipts.  As such, by listing certain items that do not include publication costs, the Royalty Contracts do not permit McGraw Hill to deduct those publication costs when calculating net receipts.

65.     McGraw Hill's decision to withhold royalties on revenues associated with Connect to offset its costs is no different than would be a decision to discount royalty payments to offset its costs in building a printing press, purchasing paper, or supplying ink in publishing paper books.  Connect is a content-delivery platform that is functionally equivalent to the "paper" on which electronic copies of textbooks are "printed."  Although McGraw Hill has undoubtedly incurred costs in developing and maintaining Connect, it is contractually prevented from passing those costs on to authors.

66.     ***Third***, the reduction in royalty payments is contrary to McGraw Hill's course of performance since the launch of Connect, which reflects its longstanding bargain with its authors. For more than eleven years since the launch of Connect, McGraw Hill paid the Royalty Percentage on the entire net receipts of electronic textbooks sold on Connect, regardless of which iteration of the Royalty Contract governed, reflecting its understanding that it is obligated to do so under the Royalty Contracts.  McGraw Hill has not been "gifting" higher royalty payments to authors for more than a decade: it is a business operating for profit.

67.     The change also constitutes a breach of McGraw Hill's duty of good faith and fair dealing.  By re-defining the "price" of the Connect-platform textbooks as only a fraction of the net

receipts of those books, McGraw Hill has arbitrarily reduced the amounts on which royalties are due.  This definitional gamesmanship deprives authors of the benefit of their bargains with McGraw Hill.

68.     McGraw Hill has sought to justify the change under the false (and irrelevant) pretense that, despite having marketed Connect for more than eleven years, it was only recently able to determine the separate market values of online sales of textbooks and standalone access to the Connect platform without a textbook.  But even if McGraw Hill was only recently able to determine how much of its revenue can directly be attributed to the recoupment of costs, that does not mean McGraw Hill is suddenly allowed to pass those costs to authors.  Similarly, it does not allow McGraw Hill to insert new terms into the Royalty Contracts and pay royalties on anything other than "net receipts" of sales.

69.     As a result of the unilateral change in how McGraw Hill calculates royalty payments, payments to authors will be significantly reduced, and they will suffer damages.

70.     With online learning becoming a more and more integral part of education, McGraw Hill's new royalty scheme has effectively transferred to itself a significant portion of revenue that would normally be allocated to authors.  By way of example, Professor Flynn's royalty payments will be reduced by approximately 37% under the new scheme, and similar reductions will be experienced by other Class members.

## V.    CLASS ALLEGATIONS

### A.    Definition of the Class

71.     Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23, and seek certification of a Class defined as follows:  All persons or entities who have entered into a Royalty Contract with McGraw Hill or any of its predecessors or successors in interest in the United States,

and whose books are currently sold on the Connect platform, and who have been harmed by McGraw Hill's reduction of royalties on sales of Connect-platform textbooks.

72.     Plaintiffs reserve the right to amend the definition of the Class if further investigation or discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

**B.     The Class Satisfies the Requirements of Rule 23**

73.     The members of the Classes are so numerous that joinder of all members is impracticable.  The precise number of Class members is unknown to Plaintiffs at this time, but Plaintiffs believe there to be more than one thousand Class members. Members of the Class may be identified through documents in McGraw Hill's possession.

74.     McGraw Hill's wrongful conduct applies generally to all the Class members, so that final relief is appropriate respecting the Class as a whole.

75.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the members of the Class are:

(a)     Whether the Royalty Contracts require McGraw Hill to pay the full Royalty Percentage on sales of Connect-platform textbooks;

(b)     Whether McGraw Hill breached the Royalty Contracts by reducing royalty payments on sales of Connect-platform textbooks;

(c)     The extent of damage sustained by Class members and the appropriate measure of damages; and

(d)     Whether the Class is entitled to injunctive relief to prevent McGraw Hill from continuing with its change of how it pays royalties on sales of Connect-platform textbooks.

76.     Plaintiffs' claims are typical of the claims of the other members of the Class they seek to represent. McGraw Hill's practices have targeted and affected all members of the Class in a similar manner, *i.e.*, they have all sustained damages arising out of McGraw Hill's practices.

77.     Plaintiffs will continue to fully and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel competent and experienced in class actions and complex litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

78.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action on the other hand, would achieve substantial economies of scale with regards to time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Furthermore, the interests of the members of the Class in individually controlling the prosecution of separate actions are theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. Finally, as the damages suffered by some of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

## CLAIMS FOR RELIEF

### I.     Count One: Breach of Contract

79.     Plaintiffs repeat and reallege every allegation contained above as if fully alleged in this Count.

80.     Count One is brought on behalf of all Class members.

81.     The Royalty Contracts are valid, enforceable contracts between Class members and McGraw Hill.

82.     Pursuant to the Royalty Contracts' express terms and McGraw Hill's longstanding course of performance, McGraw Hill must pay the Royalty Percentage on the entire net receipts of sales of textbooks on Connect.

83.     In or about November 2020, McGraw Hill unilaterally decided to change how it calculates royalty payments for online textbook sales under the Royalty Contracts.  Under its new calculation methodology, McGraw Hill will pay the Royalty Percentage only on what it unilaterally deems is the "textbook" portion of the sales, no royalty on what it unilaterally deems is the "Connect" access portion of the sales, and a reduced royalty on what it unilaterally deems is the "course materials" portion of the sales.

84.     These actions breached the Royalty Contracts.

85.     As a direct and proximate result of McGraw Hill's reduction of royalty payments, the Class has been damaged and will continue to incur additional damage, and is entitled to compensation from McGraw Hill for said damage in an amount to be proven at trial.

**II.      Count Two: Breach of the Duty of Good Faith and Fair Dealing**

86.     Plaintiffs repeat and reallege every allegation contained above as if fully alleged in this Count.

87.     Count Two is brought on behalf of all Class members.

88.     The Royalty Contracts are valid, enforceable contracts between Class members and McGraw Hill.

89.     The Royalty Contracts grant McGraw Hill the discretion to set the prices of the Works it sells.

90.     In or about November 2020, McGraw Hill unilaterally decided to change how it calculates royalty payments for online textbook sales under the Royalty Contracts.  Under its new calculation methodology, McGraw Hill will pay the Royalty Percentage only on what it unilaterally deems is the "textbook" portion of the sales, no royalty on what it unilaterally deems is the "Connect" access portion of the sales, and a reduced royalty on what it unilaterally deems is the "course materials" portion of the sales.

91.     By unilaterally defining the "price" of textbooks as only a portion of the sales, and paying the Royalty Percentage only on that diminished "price," McGraw Hill has arbitrarily and irrationally set the "price" of authors' textbooks in such a manner that reduces the royalty payments owed to the authors.  In fact, as reflected by McGraw Hill's longstanding practice prior to this recent change, the appropriate price of the textbooks is the entire net receipts on sales of Connect-platform textbooks.

92.     These actions have deprived the Class of the benefit of their bargain with McGraw Hill, and have breached McGraw Hill's duty of good faith and fair dealing to the Class.

93.     As a direct and proximate result of McGraw Hill's reduction of royalty payments, the Class has been damaged and will continue to incur additional damage, and is entitled to compensation from McGraw Hill for said damage in an amount to be proven at trial.

## VI.   PRAYER FOR RELIEF

**WHEREFORE**, on behalf of themselves and the Class, Plaintiffs pray:

94.     That the Court maintain this action as a Class action, that Plaintiffs be named as Class Representative of the Class, that the undersigned be named as Class Counsel, and direct that notice of this action be given to Class members;

95.     That the Court award declaratory relief to the effect that the Class is entitled to the Royalty Percentage on the entire net receipts of electronic textbooks sold on Connect;

96.     That the Court award compensatory damages in favor of Plaintiffs and the other Class members against Defendant, for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

97.     That the Court award Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

98.     That the Court award injunctive relief prohibiting McGraw Hill from unilaterally changing its practice of paying the Royalty Percentage on the entire net receipts of textbooks sold for use on Connect with online course materials; and

99.     That the Court award such other equitable relief as the case may require or as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby respectfully demand a jury trial as provided by Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: January 22, 2021
     New York, New York

Respectfully submitted,

**GRANT & EISENHOFER P.A.**

*/s/ Daniel L. Berger*
Daniel L. Berger (1656321)
Richard S. Schiffrin
Caitlin M. Moyna (4176897)
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Email: dberger@gelaw.com
       rschiffrin@gelaw.com
       cmoyna@gelaw.com

Andrew N. Dodemaide (*pro hac vice* pending)
123 Justison Street, 7th Floor

Wilmington, DE 19801
Tel: (302) 622-7021
Email: adodemaide@gelaw.com

*Counsel for Plaintiffs and proposed Class
Counsel*