**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SEAN FLYNN, DEAN KARLAN, JONATHAN MORDUCH, DAVID MYERS and JEAN TWENGE, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br><br> MCGRAW HILL LLC and MCGRAW HILL EDUCATION, INC., <br><br> Defendants. | Civ. No. 1:21-cv-0614-LGS <br> Civ. No. 1:21-cv-1141-LGS <br><br> <u>CONSOLIDATED CLASS ACTION</u> |

**CONSOLIDATED CLASS ACTION COMPLAINT**

Sean Flynn, Dean Karlan, Jonathan Morduch, David Myers, and Jean Twenge, (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, by their undersigned attorneys, bring this action against Defendants McGraw Hill LLC and McGraw Hill Education, Inc. (together, "McGraw Hill" or the "Company"). With knowledge of their own acts and acts occurring in their presence, and upon information and belief as to all other matters, Plaintiffs allege the following:

## I.    SUMMARY OF THE ACTION

1.    This is a federal class action that asserts claims for breach of contract against McGraw Hill, an educational publishing company. Plaintiffs bring this action on behalf of a Class, as defined below, of authors who have contracted with McGraw Hill (or one of its predecessors-

in-interest or affiliates) for McGraw Hill to publish, sell and distribute their works, pursuant to publishing agreements that provide for the payment of royalties on the net receipts from the sale of their works ("Publishing Agreements").

2.      This case arises out of McGraw Hill's breach of its contracts with authors by its unilateral action in reducing the royalties it pays to authors when it sells their textbooks, works, or parts thereof, in an electronic format. The Publishing Agreements each require that McGraw Hill pay Plaintiffs royalties on the net receipts, that is sales "price" of textbooks by number of units sold, from the sale of their works. McGraw Hill, however, has recently adopted a class-wide policy of systematically deducting revenues received from the sale of works available on its digital Connect platform to reduce the royalty base available to authors, shorting authors the royalties they are owed and enriching McGraw Hill at the authors' expense. McGraw Hill's financial alchemy violates the terms of the Publishing Agreements and amounts to a violation of McGraw Hill's duty of good faith and fair dealing.

3.      As a textbook publisher, McGraw Hill provides a platform to authors for the distribution of their works. For much of the Company's history, McGraw Hill published textbooks on a print platform with paper and ink.

4.      As more and more students and educational institutions have adopted or moved to electronic platforms in recent years, royalties on sales of electronic textbooks have become a crucial component of the overall income of the authors of those books. The majority of authors of textbooks sold by McGraw Hill are academics who supplement their incomes from their educational endeavors with royalties from sales of their works.

5.      In 2009, McGraw Hill launched an online platform called "Connect," which is used to distribute electronic textbooks. Connect is in essence a replacement for paper versions of books.

6.      Electronic textbooks ("ebooks" or "smartbooks") are the central element of the Connect platform and represent electronic versions of the authors' works. Corresponding features offered on Connect ("Core Connect Content" or "CCC") are designed based on the authors' works themselves and are exclusively offered in conjunction with their works.

7.      Since the inception of Connect, McGraw Hill has paid royalties to authors based on the entire sales price of electronic textbooks sold on Connect. That is, McGraw Hill has paid royalties to authors from the net receipts from the sales of works on Connect. This practice complies with the terms of the Publishing Agreements, which require McGraw Hill to pay royalties based on the "net receipts" of each textbook sold. The practice also comports with the terms of the Publishing Agreements that require McGraw Hill to publish textbooks "at its own expense."

8.      In direct contravention of the terms of McGraw Hill's contracts with its authors and of McGraw Hill's decade-long practice of paying royalties based on the entire net revenue earned on textbooks sold on Connect, McGraw Hill recently decided that it will pay royalties only on the portion of net revenue or relative value McGraw Hill, by its own say so, attributes to the electronic textbooks, to the exclusion of the portions it attributes to the Connect platform and the Core Connect Content.  McGraw Hill determines the "relative value" of each of these elements unilaterally.

9.      This royalty reduction is equivalent to reducing royalties for sales of paper textbooks based on McGraw Hill's costs of printing those books, which would also violate the explicit terms of the contracts.  Traditionally, the higher education industry has ***not*** deducted from the royalties owed to authors the cost to publish and market a hardcopy of a work, such as the costs of paper and of printing and binding that work. This is for good reason: the Publishing Agreements, which entitle McGraw Hill to the overwhelming majority of the money it receives from textbook

sales (typically between 80 and 90 percent, sometimes more), already account for McGraw Hill's contributions to the final product.

10.    Separately, the change constitutes a breach of McGraw Hill's duty of good faith and fair dealing.  By artificially redefining the "price" of authors' works as only a fraction of the revenues McGraw Hill receives for the sale of those works, McGraw Hill has reduced the amounts on which royalty payments are due.  In so doing, McGraw Hill has deprived Authors of the benefit of their bargains, and has improperly enriched McGraw Hill at the expense of the authors.

11.    McGraw Hill's unilateral action will cause an estimated 25% to 35% reduction in royalties paid to authors on the sales of textbooks sold for use on Connect—a significant blow to academics who rely on those royalty payments.

12.    This action seeks damages from McGraw Hill on behalf of a Class of authors, as defined below, who have contracted with McGraw Hill and who have been harmed by its unilateral reduction in royalty payments.  This action further seeks injunctive relief preventing McGraw Hill from changing how it pays royalties on online textbook sales in the absence of revised agreements with authors, and a declaratory judgment that McGraw Hill's change violates authors' contracts with the Company.

## II.    THE PARTIES

13.    Plaintiff Sean Flynn is a resident of Nevada.  Professor Flynn is a textbook author who entered into a Royalty Contract, as defined below, with McGraw Hill.  Professor Flynn is an Associate Professor of Economics at Scripps College, and is a co-author of the book "*Economics: Principles, Problems, and Policies*," which is published by McGraw Hill.  This textbook was first published in 1960 and is currently in its twenty-second edition.  As described herein, Professor Flynn was harmed when McGraw breached its contract with Professor Flynn by reducing the royalty payments he receives on online sales of his book.

14.     Plaintiff Dean Karlan is a resident of Illinois.  Professor Karlan is a textbook author who entered into a Royalty Contract, as defined below, with McGraw Hill.  Professor Karlan is a Professor of Economics and Finance, Kellogg School of Management, Northwestern University, and is a co-author of the book "*Economics*" and its single-semester split works "*Microeconomics*" and "*Macroeconomics*," which are published by McGraw Hill.  *Economics* and its split works were first published in 2013 and are currently in their third edition.  As described herein, Professor Karlan was harmed when McGraw breached its contract with Professor Karlan by reducing the royalty payments he receives on online sales of his books.

15.     Plaintiff Jonathan Morduch is a resident of New Jersey.  Professor Morduch is a textbook author who entered into a Royalty Contract, as defined below, with McGraw Hill. Professor Morduch is a Professor of Public Policy and Economics at the Wagner Graduate School of Public Service at New York University, and is a co-author of the book "*Economics*" and its single-semester split works "*Microeconomics*" and "*Macroeconomics*," which are published by McGraw Hill.  As described herein, Professor Morduch was harmed when McGraw breached its contract with Professor Morduch by reducing the royalty payments he receives on online sales of his books.

16.     Professor David Myers is a resident of Michigan.  Professor Myers is a textbook author who entered into a Royalty Contract, as defined below, with McGraw Hill.  Professor Myers is a Professor of Psychology at Hope College, and is the author of *Social Psychology* and a co-author of *Exploring Social Psychology.* Professor Myers entered into an agreement with McGraw Hill dated July 30, 1979 for the publication of *Social Psychology*, and has subsequently amended the agreement to cover multiple editions of the textbook. Professor Myers also entered into an agreement with McGraw Hill for the publication of *Exploring Social Psychology.* As described

herein, Professor Morduch was harmed when McGraw Hill breached its contract with Professor Myers by reducing the royalty payments he receives on online sales of his books.

17.    Professor Jean Twenge is a resident of California.  Professor Twenge is a textbook author who entered into a Royalty Contract, as defined below, with McGraw Hill.  Professor Twenge is a professor of Psychology at San Diego University.  She became a co-author of *Social Psychology*, starting with the thirteenth edition, and a co-author of *Exploring Social Psychology*, starting with the ninth edition. Professor Twenge entered into agreements with McGraw Hill dated May 19, 2017 and March 25, 2020 for the publication of *Social Psychology*.  Professor Twenge also entered into an agreement with McGraw Hill dated May 18, 2019 for the publication of *Exploring Social Psychology*.  As described herein, Professor Twenge was harmed when McGraw Hill breached its contract with Professor Twenge by reducing the royalty payments she receives on online sales of her book.

18.    Defendant McGraw Hill LLC is a Delaware limited liability company with its headquarters located at 1325 Avenue of the Americas, 6th Floor, New York, New York 10019. McGraw Hill LLC is the successor-in-interest to certain entities that were parties to the contracts entered into by the Class members.  Defendant McGraw Hill LLC is referenced in several publishing agreements with the authors.

19.    Defendant McGraw Hill Education, Inc. is a New York corporation with principal offices in New York.  McGraw Hill Education, Inc. is an education and technology company that serves the higher education, K-12, professional, library and workforce training markets worldwide. Defendant McGraw Hill Education, Inc. is referenced in royalty payments made to the authors.

20.    Together McGraw Hill Education, Inc. and McGraw Hill LLC are referred to herein as "McGraw Hill."

## III.    JURISDICTION AND VENUE

21.    This Court has jurisdiction over the claims alleged herein pursuant to 28 U.S.C. § 1332(d).

22.    This action is brought on behalf of a class of more than 100 authors who reside primarily outside the State of New York, and at least one member of the Class is a citizen of a State other than New York.

23.    Each of the named plaintiffs in this action is a citizen of a state different from Defendant McGraw Hill LLC, a Limited Liability Company formed under the laws of Delaware with its principal place of business in New York and Defendant McGraw Hill Education, Inc., a New York corporation with its principal place of business in New York.

24.    The amount in controversy in this action exceeds $5,000,000, exclusive of interest and costs.

25.    Venue lies within this district under 18 U.S.C. § 1965 and 28 U.S.C. § 1391. McGraw Hill maintains its headquarters in New York, New York, and conducts a substantial amount of business in this district, including contracting with members of the Class, and selling and distributing works of the Class members.

26.    Many of the relevant contracts described herein, which give rise to the Class members' claims against McGraw Hill, select New York law under their choice-of-law provisions.

## IV.    FACTS

### A.    A Short History of McGraw Hill

27.    McGraw Hill was founded in 1888 and has grown to be one of the largest educational publishing companies in the country.  The Company boasts that it partners with more than 14,000 authors and educators in various fields of study, including more than 50 Nobel laureates.  The Company also distributes content in more than 100 countries.  McGraw Hill is

owned by the private equity firm Apollo Global Management, LLC, which acquired the Company in March 2013.

28.    McGraw Hill offers educational products for students at all levels, from pre-kindergarten through higher education.  According to McGraw Hill, students of approximately 250,000 higher-education instructors and 13,000 grade school districts use its products.  In 2019, McGraw Hill and its affiliates reported total revenue of more than $1.5 billion.

29.    The core of McGraw Hill's business is publishing educational textbooks.  As a textbook publisher, McGraw Hill provides a platform to academics and other authors for the distribution of their works.  McGraw Hill is the leading provider in the market for new instructional materials in the approximately $3.4 billion U.S. higher education learning solutions market with approximately a 24% market share.

30.    Higher-education textbooks traditionally have been lucrative to publishers. According to a report published by McKinsey & Co. in 2014, college students typically spent between $500 and $1,500 annually on course materials, translating to a nearly $10 billion industry. The industry is dominated by only a handful of publishers, including McGraw Hill.

31.    Over time, McGraw Hill has migrated many of its offerings from print textbooks to digital solutions.  As reported by McGraw Hill, its portfolio of traditional print products developed over 125 years and built around market leading titles has been the foundation of its transformation into a large and growing digital learning solutions provider.

32.    Accordingly, digital content has become an increasingly important facet of McGraw Hill's business.  By 2016, McGraw Hill's sales of digital units surpassed print sales, and approximately 53% of McGraw Hill's total billings now come from digital products.

33.     In the higher education arena, the percentage of revenue from digital products is even higher: for the years ended March 31, 2020 and 2019, higher education digital revenue represented 74% ($463 million) and 64% ($423 million), of McGraw Hill's total higher education revenue, respectively.  Substantially all of McGraw Hill's higher education revenue is generated from approximately 2,000 individual titles, including print and digital formats, with no single title accounting for more than 2% of revenue regardless of whether it is available in digital format.

### B.     McGraw Hill Launches Connect

34.     In 2009, McGraw Hill launched Connect, a Content Management System ("CMS")[1] for hosting ebooks and course materials, which it described at the time as a "robust new platform for college faculty and students" that "bridges the printed page with a dynamic online learning environment."  McGraw Hill touts Connect on its website as a "course management and adaptive learning solution that enhances [the user's] unique voice and teaching style."  After the launch of Connect, certain authors—at McGraw Hill's request—promoted Connect when engaged in sales activities.

35.     According to McGraw Hill, Connect had 1.2 million users within six months of its launch.

36.     Connect is now among McGraw Hill's core digital platforms for textbook delivery. Connect is offered for most freshman and sophomore level courses in the U.S. with 4.4 million active users across campuses nationwide during the year ended March 31, 2020, a 9% increase from the prior year.

37.     The Connect platform is a single online location where teachers and students can access electronic textbooks and course materials, complete assignments and track performance.

---

[1] A Content Management System is a type of computer software that can be used, among other things, to publish documents with clearly defined ownership.

The electronic textbooks, or "ebooks," are delivered through the "SmartBook" component of Connect, which, among other things, allows the books to be viewed online and includes certain course materials.

38.    Each Connect offering consists of an ebook and Core Connect Content ("CCC"). Connect-enabled ebooks are sold together with CCC for a single unitary price. CCC cannot be purchased exclusive of an ebook.

39.    The ebook component of a Connect textbook is an online copy of the book identical to its print form. Many Connect ebooks also have a digital overlay including clickable links and videos, and adaptive study reviews that provide questions based on students' mastery of relevant topics. McGraw Hill calls these digitally enhanced ebooks "SmartBooks."

40.    CCC includes features intended to aid instructors in teaching courses and content like PowerPoint lesson plans and test banks. The majority of CCC is textbook-specific, meaning that it is designed to be used in conjunction with particular textbooks. The online course materials typically include guides, presentations, and question and answer banks, as well as other aides, and commonly draw directly from the associated textbooks. The textbook authors themselves have a significant role in developing those materials.

41.    Textbooks are the necessary component of the Connect platform. Not only do educators and students continue to seek high-quality textbooks for their courses, but the books also form the basis of the courses and CCC built around them. Simply put, if the authors did not produce the textbooks, McGraw Hill would not be able to market Connect: it would be an empty, useless platform. All of the other purposes or applications available on Connect require a textbook; without the textbook, the other applications of the platform are useless.

42.     Instructors launch courses on Connect by searching for and selecting a textbook. They are then provided with unique access codes which they pass along to their students. Each Connect course is specific to one textbook; it is impossible to launch a course on Connect or access CCC without selecting a textbook to serve as the basis for the course or to select multiple textbooks for use in the same course, further underscoring that textbooks are the necessary component of the Connect platform.

43.     Students gain access to Connect-hosted textbooks by using the access codes provided by their instructors. While some students access the books directly through the Connect platform, a growing majority of students access the books through a "single sign-on" feature called MH Campus which integrates Connect with Learning Management Systems like Blackboard or Module, systems already in use in classrooms throughout the United States. These students never visit the Connect site directly and may never even know that they are using Connect.

44.     McGraw Hill's longstanding and exclusive relationships with textbook authors make Connect possible, and provide McGraw Hill the exclusive right to produce and distribute content during the applicable copyright terms.

45.     Upon the launch of Connect, McGraw Hill began selling electronic copies of textbooks and accompanying course materials for use on the Connect platform. McGraw Hill sold and continues to sell those materials as a unit for a single, unitary price.

46.     Until recently, McGraw Hill paid to authors a royalty percentage ("Royalty Percentage"), based on "net receipts" from sales of Connect-platform textbooks—calculated by multiplying the sales "price" of the textbooks by the number of units sold. Thus, if 100 students purchased Professor Flynn's Connect-platform textbook, the royalty due to him and his co-authors

would be 18.75% of the amount represented by 100 times the selling price of the book, less deductions for discounts, credits, and returns.

47.    McGraw Hill had used this method of calculating royalties due authors for sales of their textbooks on Connect since Connect's inception in 2009.  It did not matter which iteration of the Royalty Contract was in place; McGraw Hill uniformly paid its authors a royalty based on the total net receipts for the Connect-platform textbooks.

### C.    McGraw Hill Publishing Agreements

48.    McGraw Hill's business model is premised on entering into publishing agreements with academic authors, pursuant to which (1) the author agrees to produce an academic textbook and transfer the related copyrights to McGraw Hill; (2) McGraw Hill agrees to publish and sell the textbook at its own expense; and (3) the author earns a per-sale percentage royalty on the sales of the work (each such agreement a "Royalty Contract").

49.    Regardless of sales volume, the royalty payments on sales of authors' works constitute an important part of their income.  This is especially so for academics whose salaries are relatively modest, and who therefore rely on royalty payments from McGraw Hill to supplement their incomes.

50.    The Royalty Contracts are substantially similar in all relevant respects.  They govern the terms of the authors' performances and McGraw Hill's payments to the authors for sales of their "Works," which is a defined term in the Royalty Contracts and provides for: (1) a royalty rate, applied to (2) the amount of money McGraw Hill receives, from (3) the sale of the work—no matter what format, title, delivery platform, or access code McGraw Hill chooses to use for the sale of the work.

51.    The royalty statements McGraw Hill sends its authors explain that the "Royalty Method" for domestic sales of the work is McGraw Hill's "Received Price" for the work, whether

the work is sold in hardcopy, loose leaf, eBook, Connect, inclusive access, access card, or rental format.  No matter what format or distribution platform McGraw Hill chooses to sell the author's work, McGraw Hill must pay the author royalties based upon McGraw Hill's net receipts, *i.e.*, the amount of money McGraw Hill receives for the sale.

52.    Because Connect textbooks are priced and sold as single units which include both an ebook and CCC, McGraw Hill has, until recently, paid the Royalty Percentage to authors based on "net receipts" from sales of textbooks on the Connect platform, which were calculated by multiplying the sales "price" of the textbooks by the number of units sold.

53.    McGraw Hill has in the past included provisions in author contracts to address special situations where, for instance, a portion of one author's work might have been sold with a portion of another author's work, or where an author's work might have been sold with other products.  The contractual provisions for these types of "bundled" products have never applied to standalone sales of Connect-hosted textbooks.

### D.    The Relevant Contract Provisions

54.    On May 2, 2006, Professor Flynn entered into a Royalty Contract with "The McGraw Hill Companies, Inc.," which is a McGraw Hill predecessor.  Pursuant to that Royalty Contract, Professor Flynn was made a party to an earlier May 22, 1989 agreement between (i) the co-authors of the prior editions of his book, i.e., Campbell R. McConnell and Stanley R. Brue and (ii) another McGraw Hill predecessor, McGraw Hill, Inc.  Thus, under Professor Flynn's Royalty Contract, the terms of the original 1989 agreement and its subsequent amendments govern Professor Flynn's agreement with McGraw Hill to this date.

55.    The original 1989 agreement that Professor Flynn later joined follows a standard form used at the time by McGraw Hill, Inc.

56.    Section 1 of Professor Flynn's Royalty Contract defines the "Work" and requires the author to furnish a manuscript of that work.  Specifically:

> [The Author] shall prepare and deliver to [McGraw Hill] a manuscript for a work entitled ECONOMICS: Principles, Problems, and Policies, 11th Edition (the "Work") or such other title as may be mutually agreeable to the Publisher and the Author, and the Publisher shall publish the Work, in accordance with and subject to the provisions of this Agreement dated May 22, 1989.

57.    Section 6 of Professor Flynn's Royalty Contract, in relevant part, requires McGraw Hill to publish the work at its own expense:

> After giving written notice to the Author that it has accepted the Work as being in form and content satisfactory for publication, ***the Publisher shall publish the Work at its own expense*** at such time and in such style and manner and with such trademarks, service marks, and imprints of the Publisher, and sell the Work at such prices, as it shall deem suitable. (Emphasis added).

58.    Section 7 of Professor Flynn's Royalty Contract specifies the size of the royalty payments due on different types of sales of the author's work.  Such royalty payments are expressed as a percentage of the net receipts received, and there are different percentages for different categories of sales.  Section 7(a)(1) is the relevant provision here, and sets forth the royalties due for domestic sales, expressed as a percentage of net receipts (as used herein, the "Royalty Percentage"):

> As full payment to the Author, the Publisher shall pay to the Author . . . [a] percentage of the ***Publisher's net receipts*** for each copy of the Work sold by the Publisher for use within the United States (except as otherwise provided in this Section 7), as follows: 18.75 percent on all copies[.]  The number of copies sold that determines the royalty percentage payable on sales for use within the United States shall include all domestic and foreign sales made by the Publisher.  This schedule of royalty percentages shall apply separately to each edition of the Work. (Emphasis added).

59.    Section 7(c) of Professor Flynn's Royalty Contract defines "net receipts":

> The term "Publisher's net receipts" shall mean the Publisher's *selling price*, less discounts, credits, and returns, or a reasonable reserve for returns. [Emphasis added.]

60.    Section 11 of Professor Flynn's Royalty Contract provides that New York law governs the Contract:

> This Agreement shall in all respects be interpreted and construed in accordance with and governed by the laws of the State of New York, regardless of the place of its execution or performance.

61.    In or around 2006, McGraw Hill amended older Royalty Contracts to include a new provision making clear that the domestic royalty rate also applies to electronic sales of the works. Thus, Section 7(a)(6) of Professor Flynn's Royalty Contract was amended on May 11, 2006 to state that the "Royalty for electronic rights to the work is the same as the domestic royalty rate: 18.75%."

62.    On November 12, 2008, Professors Karlan and Morduch entered into a Royalty Contract with The McGraw Hill Companies, Inc., a McGraw Hill predecessor.

63.    Section 1 of Professor Karlan and Professor Morduch's Royalty Contract defines the "Work" and requires the author to furnish a manuscript of the work:

> The Author agrees to prepare for publication a work tentatively titled *Principles of Economics*, which includes the two-semester *Principles of Economics* work and the one-semester split versions of the work, tentatively titled *Principles of Microeconomics* and *Principles of Macroeconomics*, respectively, and both collectively, known as the "Work."

64.    Under Section 10(A) of Professor Karlan and Professor Morduch's Royalty Contract, McGraw Hill agrees to publish the work at its own expense:

> After the Publisher's acceptance of the complete, final revised manuscript, ***the Publisher will publish the Work in book and/or electronic form at its own expense***. All decisions as to style of printing, paper and binding, trademark, logo or imprint, single or multiple volume format, design and programming of electronic editions, selection of title and cover, price(s) and all other matters

15

> involving terms of sale, distribution, advertising, promotion, appearance, design and format of the Work will be made by the Publisher in its sole discretion; provided the Publisher shall consult with the Author regarding the sales price, title, authorship credit, jacket design, use of the Author's name and likenesses in the Work and in marketing materials. [Emphasis added.]

65.     Section 3 of Professor Karlan and Professor Morduch's Royalty Contract sets forth

the royalties due on sales of the work:

> The Publisher will pay the Author a royalty of 17% of the ***Publisher's net receipts*** from the sale of all print, custom and electronic editions of the "Work", except as otherwise provided in this Agreement. [Emphasis added.]

66.     Section 12(D)(i) of Professor Karlan and Professor Morduch's Royalty Contract

defines "net receipts" as follows:

> "Net receipts" from the Work means the Publisher's ***selling price*** from each copy of ***any edition or version*** of the Work sold or licensed by the Publisher, after any discounts, rebates and amounts credited for returns, and less a reasonable reserve for future returns, and shall not include shipping or handling charges or sales, excise, value added or similar taxes, if any. [Emphasis added.]

67.     Section 20(A) of Professor Karlan and Professor Morduch's Royalty Contract

provides that New York law governs the Contract:

> This Agreement will be interpreted, enforced and construed in accordance with and governed by the laws of the State of New York, regardless of the place of its execution or performance and without regard to rules regarding the conflict of laws.  The parties agree that any disputes arising out of or related to this Agreement will be brought only in the state or federal courts with jurisdiction in New York County, New York, and the parties expressly consent to the exclusive jurisdiction of such courts for such purposes.

68.     The original contract for Professors Twenge and Myers' book *Social Psychology*

provides:

> [T]he Publisher shall pay to the Author the following royalties . . . 12.5 percent of the Publisher's net receipts from each copy of the Work sold by the Publisher for use within the United States.

69.     The most recent *Social Psychology* Agreement provides: "[t]he Publisher will pay the Author a royalty of 15% of the ***Publisher's net receipts*** from the sale of print, custom and electronic editions of the Work" (emphasis added).  Professors Twenge and Myers' Royalty Contracts define "Publisher's net receipts" as "the Publisher's ***selling price*** less discounts, credits, and returns, or a reasonable reserve for returns" (emphasis added). This means that under the terms of the Publishing Agreements, McGraw Hill may not deduct development, marketing, or publication costs from the "Publisher's net receipts."

70.     Twenge and Myers' royalty contracts further provide that "[a]fter giving written notice to the author that it has accepted the Work as being in form and content satisfactory for publication, the Publisher shall publish the work ***at its own expense*** at such time and in such style and manner" as it shall deem suitable.

71.     As these contracts illustrate, the McGraw Hill Royalty Contracts with textbook authors share the same key provisions:

- The author delivers a manuscript of the work, which McGraw Hill must publish at its own expense.

- Royalties are paid royalties as a percentage of the publisher's "net receipts" from the sale of the work, in print and electronic editions.

- "Net receipts" is defined as the "selling price" less certain items that *do not* include the costs of publishing.

72.     Without any alteration to the terms above, certain Royalty Contracts contemplate that multiple authors will contribute to a single work, in which case the Contracts delineate how royalties are to be allocated among the authors.

73.     The key terms of McGraw Hill's Royalty Contracts are substantively the same for each Class member, although each contract sets forth a different Royalty Percentage due on the sales of that author's works.  Thus, for instance, one author might be paid a royalty of 15% of

McGraw Hill's net receipts on sales, while another author might be paid 12%. Regardless, the royalty base is substantively the same across agreements: net receipts from sales of the work, in print and electronic format.

**E.  McGraw Hill's Unlawful Manipulation of Authors' Royalties**

74.    For more than a decade, McGraw Hill has purported to pay royalties to authors based on the entire sales price of electronic textbooks sold for the Connect platform. McGraw Hill's prior practice of paying royalties based on the entire sales price complies with the terms of the Publishing Agreements, which require McGraw Hill to pay royalties based on the "net receipts" of each textbook sold. The practice also comports with the terms of the Publishing Agreements that require McGraw Hill to publish textbooks "at its own expense."

75.    Despite its established and longstanding practice of paying the Royalty Percentage on the entire net receipts of textbooks on the Connect platform, in or about November 2020, McGraw Hill changed how it calculates and pays royalties on Connect textbook sales.

76.    McGraw Hill communicated its new policy to its authors via email. For example, in an email from McGraw Hill to Professor Flynn on November 23, 2020, McGraw Hill stated:

> effective with the current royalty period, the royalty for sales of the ebook within the Connect product will be paid on the revenue attributed to the ebook component, determined proportionally based on the stand-alone list price of the ebook of corresponding duration to the Connect product divided by the list price of the Connect product. In addition, a permissions fee attributed to the [course materials] component will be paid for the re-use of the ebook content in McGraw Hill's SmartBook technology and other tools within the same Connect product. The revenue attributed to the [course materials] component will be any revenue not attributed proportionally to the ebook or platform components.

77.    In November and December 2020, over 10 years after the introduction of Connect, McGraw Hill announced that "[e]ffective with this current royalty period," July through December 2020, it would no longer pay royalties to authors based on the entire sales price of an electronic

textbook sold for use on Connect. Instead, McGraw Hill said it would only pay royalties on "the revenue attributed to the ebook component," a term nowhere defined or even mentioned in its Royalty Contracts. According to McGraw Hill, the Company will unilaterally determine the "relative value" of the (1) ebook, (2) the Connect platform and (3) the CCC, and pay royalties only on the portion of the electronic textbook that the Company attributes to the ebook. Thus, McGraw Hill has unilaterally amended the contract terms without the permission or agreement of the authors.

78. This unprecedented reduction constitutes a breach of contract in three ways. ***First***, it violates the explicit terms of the Royalty Contracts by introducing new terms that are not present in the Royalty Contracts. McGraw Hill will now pay royalties based on the "revenue attributed to the ebook component," a term found nowhere in the Royalty Contracts. Rather, the Royalty Contracts require McGraw Hill to pay royalties based on the "net receipts" of sales, which is defined as the "selling price" less certain items.

79. ***Second***, the reduction violates the explicit terms of the Royalty Contracts which prevent McGraw Hill from passing its publication costs to authors. Two provisions are relevant: the requirement that McGraw Hill publish each work "at its own expense," and the definition of "net receipts" on which royalties are paid. By requiring McGraw Hill to publish each work "at its own expense," the Royalty Contracts expressly require McGraw Hill to absorb the costs of publication. Similarly, the definition of "net receipts" sets forth an express list of certain items that may be deducted from the "selling price," such as discounts, rebates, and credits. Publication costs are not among the items listed that may be deducted in calculating net receipts. As such, by listing certain items that do not include publication costs, the Royalty Contracts do not permit McGraw Hill to deduct those publication costs when calculating net receipts. Moreover, the terms

of the agreements already account for McGraw Hill's contributions and publication costs. The Authors' royalty rates, typically well under 20%, provide McGraw Hill the lion's share of the revenue from sales of works, including revenue to pay for any expenses or work it contributes to the sale of the work.

80.    Under McGraw Hill's new system, McGraw Hill will deduct amounts it traditionally attributes to development expenses associated with Connect—including a platform fee—from the amount McGraw Hill receives for the sale and then will apply the author's royalty rate to the amount that remains after the deduction.  This new policy will retroactively apply to the July 1 to December 31, 2020 royalty period.  But McGraw Hill's new policy is nowhere permitted in the Royalty Contracts, which require McGraw Hill to pay royalties based upon the "net receipts," that is, the entire amount of money McGraw Hill receives for the sale less certain enumerated items, no matter the format, title, or delivery platform McGraw Hill chooses to use for the sale.

81.    McGraw Hill's decision to withhold royalties on revenues associated with its online platform to offset its costs is no different than would be a decision to discount royalty payments to offset its costs in building a printing press, purchasing paper, or supplying ink in publishing paper books.  And both are breaches of the publishing agreements.  Connect is a content-delivery platform that is functionally equivalent to the paper on which electronic copies of textbooks are printed.  Although McGraw Hill has undoubtedly incurred costs in developing and maintaining Connect, it is contractually prevented from passing those costs on to authors.

82.    The fact that McGraw Hill does not even make Connect materials available for sale separate and apart from the textbooks reinforces that the Connect platform and CCC are simply content delivery systems for McGraw Hill textbooks and not commodities in their own right.

Instead, Connect functionalities are only accessible by purchasing or accessing the textbook. And the major Connect functionalities, such as integrated eBooks and course and assignment set-up tools, are all course-specific and tied to the text of the book. To the extent that McGraw Hill has attempted to sell the Connect functionalities separately, those functionalities have little to no market value when sold separate and apart from the textbook.

83.     **Third**, the reduction in royalty payments is contrary to McGraw Hill's course of performance, which reflects its longstanding bargain with its authors. For more than eleven years following the launch of Connect, McGraw Hill paid the Royalty Percentage on the entire net receipts of electronic textbooks sold on Connect, regardless of which iteration of the Royalty Contract governed, reflecting its understanding that it is obligated to do so under the Royalty Contracts. McGraw Hill has not been "gifting" higher royalty payments to authors for more than a decade: it is a business operating for profit.

84.     McGraw Hill's annual reports are consistent with its longstanding practice. As recently as March 31, 2020, McGraw Hill's annual report explains that costs associated with print and digital products, such as Connect, are treated as expenses—not independently valued products:

> A significant component of our total operating and administration expense relates to our ongoing investment in DPG [the Digital Product Group] . . . .
>
> ***Costs associated with design and content creation for both digital and print products are capitalized as a component of pre-publication expenditures.*** Capitalized pre-publication expenditures are subsequently amortized as a component of operating and administration expenses . . . .
>
> Outside of costs directly associated with DPG, we incur additional digital related costs, including content tagging and digital solutions hosting, which have increased as the digital transformation continues. The Company relies primarily on internal resources to develop the Company's digital platform, host the Company's digital solutions and tag the Company's digital content, and ***these costs have no clear attribution to specific products or services and do not directly correlate to sales of products or delivery of services. As a result, the Company has classified these costs within operating and administrative expenses.***

85.    The change in the way McGraw Hill allocates royalties also constitutes a breach of McGraw Hill's duty of good faith and fair dealing.  By re-defining the "price" of the Connect-platform textbooks as only a fraction of the net receipts of those books, McGraw Hill has arbitrarily reduced the amounts on which royalties are due.  This definitional gamesmanship deprives authors of the benefit of their bargains with McGraw Hill, and improperly lines the pockets of McGraw Hill.

86.    McGraw Hill has arbitrarily assigned "value" to materials in a way that that substantially undercuts the royalty base attributed to authors.  Thus, even if McGraw Hill is permitted under the Publishing Agreements to deduct from authors' royalty bases the "relative value" of other elements that McGraw Hill unilaterally included with the sale of the authors' works, McGraw Hill is still in breach of the Publishing Agreements because it is not fairly or accurately ascribing portions of McGraw Hill's "selling price" as royalty-bearing versus non-royalty bearing.  This is a breach of the express terms of the Publishing Agreements, as well as the implied covenant of good faith and fair dealing.

87.    McGraw Hill has sought to justify the change under the false (and irrelevant) pretense that, despite having marketed Connect for many years, it was only recently able to determine the separate market values of online sales of textbooks and standalone access to the Connect platform without a textbook.  McGraw Hill stated in an email to its Connect authors that "it was only recently that McGraw Hill had an objective way of determining the relative value of the three components of the Connect product (*i.e.*, the ebook, the platform, and the course-specific content and technology accessed through the platform, which we refer to as CCC)."

88.    But even if McGraw Hill only recently determined how much of its revenue can directly be attributed to Connect, that does not mean McGraw Hill is suddenly allowed to pass on

the costs associated with Connect to its authors.  Similarly, it does not allow McGraw Hill to insert new terms into the Royalty Contracts and pay royalties on anything other than "net receipts" of sales.

89.    As a result of the unilateral change in the way McGraw Hill calculates royalty payments, payments to Authors will be significantly reduced, and the Authors will suffer damages.

90.    With online learning becoming a more and more integral part of education, McGraw Hill's new royalty scheme has effectively transferred to itself a significant portion of revenue that would normally be allocated to authors.  By way of example, Professor Flynn's royalty payments will be reduced by approximately 37% under the new scheme, and similar reductions will be experienced by other Class members.

## V.    CLASS ALLEGATIONS

### A.    Definition of the Class

91.    Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23, and seek certification of a Class defined as follows:  All persons or entities who have entered into a Royalty Contract with McGraw Hill or any of its predecessors or successors in interest in the United States, and whose books are currently sold on the Connect platform, and who have been harmed by McGraw Hill's reduction of royalties on sales of Connect-platform textbooks.

92.    Plaintiffs reserve the right to amend the definition of the Class if further investigation or discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

### B.    The Class Satisfies the Requirements of Rule 23

93.    The members of the Classes are so numerous that joinder of all members is impracticable.  The precise number of Class members is unknown to Plaintiffs at this time, but

Plaintiffs believe there to be more than one thousand Class members. Members of the Class may be identified through documents in McGraw Hill's possession.

94.     McGraw Hill's wrongful conduct applies generally to all the Class members, so that final relief for the Class as a whole is appropriate.

95.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the members of the Class are:

(a)   how McGraw Hill calculates compensation owed to Class members under the Publishing Agreements for works sold for use on Connect;

(b)   whether McGraw Hill breached its contracts with the Class members by failing to compensate Class members in accordance with the terms of the Publishing Agreements;

(c)   whether McGraw Hill improperly deducted revenue from the royalty base used to calculate author royalties for Connect by deeming functionalities intertwined with the electronic work as separate and apart from the work;

(d)   whether McGraw Hill improperly inflated the values of its own contributions to Connect relative to authors' works;

(e)   whether McGraw Hill misallocated revenue between royalty bearing and non-royalty bearing materials on Connect in bad faith;

(f)   whether McGraw Hill's deduction of platform fees or design and creation costs from royalty-bearing revenue is a breach of the express terms of the Publishing Agreements;

(g) whether McGraw Hill's deduction of platform fees for design and creation costs from royalty-bearing revenue is a breach of the implied covenant of good faith and fair dealing;

(h) whether Plaintiffs and Class members are entitled to receive damages as a result of the unlawful conduct by Defendant alleged herein and the methodology for calculating those damages; and

(i) Whether the Class is entitled to injunctive relief to prevent McGraw Hill from continuing with its change of how it pays royalties on sales of Connect-platform textbooks.

96. Plaintiffs' claims are typical of the claims of the other members of the Class they seek to represent. McGraw Hill's practices have targeted and affected all members of the Class in a similar manner, *i.e.*, they have all sustained damages arising out of McGraw Hill's practices.

97. Plaintiffs will continue to fully and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel competent and experienced in class actions and complex litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

98. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Due to the complexity of issues involved in this action and the expense of litigating the claims, few, if any, Class members could afford to seek legal redress individually for the wrongs that McGraw Hill committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions, especially due to the potential retaliation Class members may face from McGraw Hill by prosecuting individual actions. In addition, the prosecution of separate actions by individual members of the Class would impose heavy burdens

upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.

99.     A class action on the other hand, would achieve substantial economies of scale with regards to time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.  Furthermore, the interests of the members of the Class in individually controlling the prosecution of separate actions are theoretical rather than practical.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  Finally, as the damages suffered by some of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

<u>**CLAIMS FOR RELIEF**</u>

**VI.    COUNT ONE: BREACH OF CONTRACT**

100.    Plaintiffs repeat and reallege every allegation contained above as if fully alleged in this Count.

101.    Count One is brought on behalf of all Class members against Defendants McGraw Hill LLC and McGraw Hill Education, Inc.

102.    The Publishing Agreements are valid, enforceable contracts between Class members and McGraw Hill.

103.    McGraw Hill has improperly deducted revenues and applied platform fees against works marketed and sold for use on Connect, depriving Class members of royalties they are rightfully owed, and has thereby materially breached the Publishing Agreements.

104.    ***First,*** McGraw Hill, without any contractual basis, has improperly deducted expenses associated with the development of Connect from the money McGraw Hill receives for

purchases of works marketed and sold for use on Connect (*i.e.*, net receipts). By improperly deducting revenue from the "net receipts" royalty base used to calculate author royalties, McGraw Hill has systematically underpaid Class members the royalties they are owed under the Publishing Agreements, in breach of those agreements.

105.    ***Second***, McGraw Hill has improperly charged authors a Connect platform fee against the money McGraw Hill receives for purchases of works marketed and sold for use on Connect.  By improperly charging authors a Connect platform fee against the "net receipts" royalty base used to calculate author royalties, McGraw Hill has systematically underpaid Class members the royalties they are owed under the Publishing Agreements, in breach of those agreements.

106.    ***Third***, McGraw Hill has improperly and inaccurately overvalued McGraw Hill's contributions to Connect, such as homework, quizzes, tests, and digital functionalities, and has systematically understated Authors' contributions.  In other words, McGraw Hill has failed to accurately allocate revenue received from Connect sales between the royalty bearing works of the authors and the contributions that McGraw Hill has traditionally treated as a component of operating and administrative expenses.  As a result, McGraw Hill has systematically underpaid Class members the royalties they are owed under the Publishing Agreements, in breach of those agreements.

107.    Plaintiffs have performed all of their obligations under the Publishing Agreements, except to the extent that their obligations have been excused by McGraw Hill's conduct as set forth herein.

108.    As a direct and proximate result of McGraw Hill's reduction of royalty payments, the Class has been damaged and will continue to incur additional damage and is entitled to compensation from McGraw Hill for said damage in an amount to be proven at trial.

**VII.    COUNT TWO: BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**

109.    Plaintiffs repeat and reallege every allegation contained above as if fully alleged in this Count.

110.    Count Two is brought on behalf of all Class members.

111.    The Royalty Contracts are valid, enforceable contracts between Class members and McGraw Hill.

112.    The Royalty Contracts grant McGraw Hill the discretion to set the prices of the works its sells.

113.    In or about November 2020, McGraw Hill unilaterally decided to change how it calculates royalty payments for online textbook sales under the Royalty Contracts.  Under its new calculation methodology, McGraw Hill will pay the Royalty Percentage only on what it unilaterally deems is the "textbook" portion of the sales, no royalty on what it unilaterally deems is the "platform portion of the sales," and a reduced royalty on what it unilaterally deems is the "course materials" portion of the sales.

114.    By unilaterally defining the "price" of textbooks as only a portion of the sales, and paying the Royalty Percentage only on that diminished "price," McGraw Hill has arbitrarily and irrationally set the "price" of authors' textbooks in such a manner that reduces the royalty payments owed to the authors and appropriates what should go to authors instead to McGraw Hill.  In fact, as reflected by McGraw Hill's longstanding practice prior to this recent change, the appropriate price of the textbooks is the entire net receipts on sales of Connect-platform textbooks. McGraw Hill's recent actions amount to nothing more than a bad faith effort to enrich itself at the expense of authors.

115.    These actions have deprived the Class of the benefit of their bargain with McGraw Hill, and have breached McGraw Hill's duty of good faith and fair dealing to the Class.

116.    As a direct and proximate result of McGraw Hill's reduction of royalty payments, the Class has been damaged and will continue to incur additional damage, and is entitled to compensation from McGraw Hill for said damage in an amount to be proven at trial.

### PRAYER FOR RELIEF

**WHEREFORE**, on behalf of themselves and the Class, Plaintiffs pray:

117.    That the Court maintain this action as a Class action, that Plaintiffs be named as Class Representative of the Class, that the undersigned be named as Class Counsel, and direct that notice of this action be given to Class members;

118.    That the Court award declaratory relief to the effect that the Class is entitled to the Royalty Percentage on the entire net receipts of electronic textbooks sold on Connect;

119.    That the Court award compensatory damages in favor of Plaintiffs and the other Class members against Defendant, for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

120.    That the Court award Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

121.    That the Court award injunctive relief prohibiting McGraw Hill from unilaterally changing its practice of paying the Royalty Percentage on the entire net receipts of textbooks sold for use on Connect with online course materials; and

122.    That the Court award such other equitable relief as the case may require or as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

123.    Plaintiffs hereby respectfully demand a jury trial as provided by Rule 38(b) of the

Federal Rules of Civil Procedure.

Dated: March 19, 2021

**GRANT & EISENHOFER P.A.**

*/s/  Daniel L. Berger*
Daniel L. Berger (1656321)
Richard S. Schiffrin
Caitlin M. Moyna (4176897)
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Email: dberger@gelaw.com
        rschiffrin@gelaw.com
        cmoyna@gelaw.com

Andrew N. Dodemaide (*pro hac vice*
pending)

123 Justison Street, 7th Floor
Wilmington, DE 19801
Tel: (302) 622-7021
Email: adodemaide@gelaw.com

**SUSMAN GODFREY L.L.P.**

*/s/ Chanler A. Langham*
Chanler A. Langham
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Tel: 713-651-9366
Fax: 713-654-6666
clangham@susmangodfrey.com

Kalpana Srinivasan (*pro hac vice*)
Steven G. Sklaver (*pro hac vice*)
Rohit D. Nath (*pro hac vice*)
1900 Avenue of the Stars, Suite 1400

Los Angeles, CA 90067-6029
Tel: 310-789-3100
Fax: 310-789-3150
ssklaver@susmangodfrey.com
ksrinivasan@susmangodfrey.com
rnath@susmangodfrey.com

Tamar Lusztig
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Tel.: 212-336-8330
Fax: 212-336-8340
tlusztig@susmangodfrey.com

Alexander W. Aiken (*pro hac vice*)
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Tel.: (206) 516-3880
Fax: (206) 516-3883
aaiken@susmangodfrey.com

*Counsel for the Plaintiffs and Interim Co-Lead Class Counsel*