**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SEAN FLYNN, DEAN KARLAN, JONATHAN MORDUCH, DAVID MYERS and JEAN TWENGE, individually and on behalf of all others similarly situated, | Civ. No. 1:21-cv-0614-LGS Civ. No. 1:21-cv-1141-LGS |
| Plaintiffs, | |
| v. | |
| MCGRAW HILL LLC and MCGRAW HILL EDUCATION, INC., | |
| Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

## TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ........................................................................................ 1

II.  FACTS........................................................................................................................... 5

III.  ARGUMENT ................................................................................................................. 9

    A. The Legal Standard for a Motion to Dismiss .................................................... 9

    B. McGraw Hill Breached the Express Terms of the Royalty Contracts............................. 10

        1.  McGraw Hill Breached the Unambiguous Terms of
           the Royalty Contracts............................................................................ 10

        2.  McGraw Hill Cannot Show That the Plain Terms of the
           Royalty Contracts Unambiguously Support Its Interpretation............................. 17

    C. The Complaint States a Claim for Breach of the Implied Covenant of
       Good Faith and Fair Dealing ............................................................................ 20

        1.  McGraw Hill Has Acted in Bad Faith by Devaluing the Works ......................... 20

        2.  The Implied Covenant Claim Is Distinct from the Breach
           of Contract Claim................................................................................. 22

IV.  CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
  98 N.Y.2d 144 (2002) ........................................................................20

*Arden Way Assocs. v. Boesky*,
  664 F. Supp. 855 (S.D.N.Y. 1987)........................................................15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................10

*Auscape Int'l v. Nat'l Geographic Soc.*,
  282 F. App'x 890 (2d Cir. 2008) .........................................................19

*Bank of New York Tr. Co. v. Franklin Advisers, Inc.*,
  726 F.3d 269 (2d Cir. 2013)..............................................................18

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................9

*Bernstein v. Cengage Learning, Inc.*,
  No. 19-cv-7541 (ALC), 2020 WL 5819862 (S.D.N.Y. Sept. 29, 2020).......................3, 13, 22

*Dalton v. Educ. Testing Serv.*,
  87 N.Y.2d 384 (1995) .....................................................................4, 20

*Electra v. 59 Murray Enterprises, Inc.*,
  987 F.3d 233 (2d Cir. 2021)..............................................................17

*Errant Gene Therapeutics, LLC v. Sloan-Kettering Inst. for Cancer Rsch.*,
  No. 15-CV-2044 (AJN), 2016 WL 205445 (S.D.N.Y. Jan. 15, 2016) .............................10, 17

*Gitman v. Pearson Educ., Inc.*,
  No. 14 CIV. 8626 GBD, 2015 WL 5122564 (S.D.N.Y. Aug. 31, 2015)................................24

*Gulf Ins. Co. v Transatlantic Reins. Co.*,
  69 A.D.3d 71 (N.Y. App. Div. 1st Dep't, 2004).....................................................18

*In re InSITE Services Corp., LLC*,
  287 B.R. 79 (Bankr. S.D.N.Y. 2002) .............................................................23, 24

*Keiler v. Harlequin Enters. Ltd.*,
  751 F.3d 64 (2d Cir. 2014)..............................................................9, 10

*Muzak Corp. v. Hotel Taft Corp.*,
  1 N.Y.2d 42 (N.Y. 1956) ...................................................................................3, 18

*New Moon Shipping MAN B&W Diesel AG*,
  121 F.3d 24 (2d Cir. 1997) .......................................................................................18

*Old Colony Tr. Co. v. City of Omaha*,
  230 U.S. 100 (1913) ...................................................................................................18

*Orlander v. Staples, Inc.*,
  802 F.3d 289 (2d Cir. 2015) .....................................................................................10

*Spinelli v. Nat'l Football League*,
  903 F.3d 185 ..............................................................................................4, 20, 22, 24

*Starr Indem. & Liab. Co. v. Brightstar Corp.*,
  388 F. Supp. 3d 304 (S.D.N.Y. 2019) ..................................................................3, 18

*Ward v. Nat'l Geographic Soc'y*,
  284 F. App'x 822 (2d Cir. 2008) ............................................................................18

*Weinstein Co. v. Smokewood Ent. Grp., LLC*,
  664 F. 2d 332 (S.D.N.Y. 2009) ...............................................................................15

*In re World Trade Ctr. Disaster Site Litig.*,
  754 F.3d 114 (2d Cir. 2014) .....................................................................................12

## I.   PRELIMINARY STATEMENT

This case concerns Defendants McGraw Hill LLC's and McGraw Hill Education, Inc.'s (together, "McGraw Hill" or the "Company") breach of the contracts it has with academic and educational authors for whom it publishes textbooks.  Despite the unambiguous language of these contracts requiring McGraw Hill to pay royalties on the entire "net receipts" (derived directly from the "selling price") of each "Work," McGraw Hill implemented a new royalty payment plan that slashes royalties paid to authors when McGraw Hill sells their works on its "Connect" platform. After ten years of seamlessly paying royalties on the sales price of works sold via Connect, as McGraw Hill is contractually obligated to do, the Company recently began paying royalties on a mere fraction of the sales price.  McGraw Hill's new royalty payment policy violates the express terms of the royalty agreements (the "Royalty Contracts") and evidences McGraw Hill's bad faith. McGraw Hill's motion to dismiss advances no arguments that defeat Plaintiffs' straightforward breach of contract and implied covenant claims, and it should therefore be denied.

Connect is a digital platform through which McGraw Hill sells electronic versions of authors' works.  ¶¶ 37-43, 45.[1]  Just as for hardcopy sales, the Royalty Contracts require McGraw Hill to pay royalties on net receipts for sales of their works on Connect.  *Id.*  After launching Connect in 2009, McGraw Hill—for more than a decade—paid royalties on Connect sales just as it had for print textbooks, that is, on a percentage of the entire sales price (or "net receipts") from the sale of the work.  For example, if a hardcopy or Connect version of the work sold for $100, McGraw Hill applied the authors' contractually-specified royalty rate (*e.g.*, 15%) to the full sales price to calculate royalties owed (*e.g.*, $15).  ¶¶ 7, 46-47, 74.  But this practice changed suddenly and dramatically in November 2020.  McGraw Hill began calculating royalties for Connect sales

---

[1] Paragraph references herein are to the Amended Consolidated Class Action Complaint, ECF No. 13.

differently, to its advantage and to the detriment of authors, by (1) arbitrarily reducing the sales revenue on which McGraw Hill pays royalties; and (2) assessing a platform fee on authors for all Connect sales.  Now, on a $100 Connect sale, McGraw Hill applies the applicable author's royalty percentage (in this example, 15%) only on approximately $65 to $75 dollars' worth of the sale— pocketing the remainder without paying a penny of royalties.  This practice places McGraw Hill in breach of its Royalty Contracts for the following reasons.

*First*, McGraw Hill's new policy violates the provisions of the Royalty Contracts requiring McGraw Hill to pay royalties on the "net receipts" (*i.e.*, "selling price less discounts, credits, and returns, or a reasonable reserve for returns") of sales.  ¶¶ 58-59, 65-66, 68-69.  The Royalty Contracts explicitly require McGraw Hill to pay royalties on the entire amount of money McGraw Hill receives for a sale, no matter the format, title, or delivery platform McGraw Hill chooses to use when publishing a work.  ¶¶ 50, 57, 59, 64, 66, 80.  McGraw Hill sells Connect versions of works for a single, unitary "selling price" and the contracts require McGraw Hill to pay royalties based on that single price.  McGraw Hill, however, is not doing so.   Instead, its new policy impermissibly deducts a platform fee from net receipts and further reduces net receipts by an amount it unilaterally allocates to course materials.  Although McGraw Hill says it is now paying royalties chiefly on the "revenue attributed to the ebook component" of a sale, McGraw Hill is not permitted to insert that term in the Royalty Contracts by its mere say so.  And McGraw Hill's argument that it owes royalties only on the "Work" does not alter that it must pay royalties on the entire "net receipts" of the sale of the Work regardless of the format sold, including Works sold on Connect.

*Second*, the "platform fee" assessed on all Connect sales also violates the requirement that McGraw Hill publish the works "at its own expense."  ¶¶ 57, 64, 70-71.  Just as McGraw Hill must

absorb the costs of paper, ink, and printing facilities when publishing physical textbooks, it must absorb the costs of developing, publishing, and delivering a work in digital format, including via Connect.  The Royalty Contracts already compensate McGraw Hill for fronting publication costs by allocating approximately 80 to 90 percent of revenues to the Company—that is why authors get only a 10 to 20 percent royalty.  ¶ 9.  By taking a platform fee *in addition* to taking the lion's share of revenues from Connect sales, McGraw Hill is taking an extra helping of profits and burdening its authors with publication costs, further violating the express terms of the Royalty Contracts. Plaintiffs' platform-fee allegations distinguish this case from the central (and non-precedential) case on which McGraw Hill relies, *Bernstein v. Cengage Learning, Inc.*, No. 19-cv-7541 (ALC), 2020 WL 5819862 (S.D.N.Y. Sept. 29, 2020), which did not involve allegations of an illegal platform fee.

*Third*, if for any reason the Court concludes that four-corners of the contractual provisions at issue are ambiguous, it would be improper on the pleadings to interpret the contract adversely to Plaintiffs given the alleged extrinsic evidence at issue.  That is because the royalty reduction contradicts McGraw Hill's course of performance during the decade since Connect's launch.  The parties' course of performance is "considered to be the most persuasive evidence of the agreed intention of the parties." *Starr Indem. & Liab. Co. v. Brightstar Corp.*, 388 F. Supp. 3d 304, 329 (S.D.N.Y. 2019), *aff'd on opinion below,* 828 F. App'x 84 (2d Cir. 2020) (citation omitted).  By paying royalties on the entire net receipts of Connect sales for more than ten years beginning with the launch of Connect, McGraw Hill acknowledged that the Royalty Contracts required it to calculate royalties in that manner.  *See, e.g.*, *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46-47 (N.Y. 1956) ("[T]he defendant's course of conduct in paying the license fees for more than 12 years after the end of the contract period acknowledges its obligation to pay the license fee for the

use of the equipment").  Contrary to McGraw Hill's assertion (and spin on the facts improperly seen in the light most favorable to it, which is not permitted on a motion to dismiss), as a business operating for profit, McGraw Hill has not been "gifting" higher royalty payments to authors since 2009; rather, it paid royalties the way it did because the contracts required it.

*Fourth,* in addition to violating the express terms of the Royalty Contracts, the royalty reduction breaches the implied covenant of good faith and fair dealing, which recognizes "a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (quotations omitted); *see also Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018).  McGraw Hill's new royalty-payment practices undervalue authors' contributions to the Connect platform, depriving authors of the ability to receive the fruits of the contract to which they are entitled.  ¶ 85.  Under McGraw Hill's new royalty initiative, it only attributes a fraction of the revenue it receives from Connect sales to authors' works, even though "[t]extbooks are the necessary component of the Connect platform," which is otherwise useless.  ¶ 41.  Indeed, the new initiative is expected to reduce author royalties by at least 25% to 35%.  ¶ 11.  McGraw Hill's new royalty initiative is thus nothing more than an act of bad faith designed to reduce royalty payments to authors and give McGraw Hill more of the pie than it is due.  Underscoring that point, McGraw Hill's purported explanation for the reduction is that it only recently learned how to price an ebook. ¶ 87.  The idea that a multibillion-dollar publishing house took ten years to value one of its products is absurd, and McGraw Hill's abrupt change (after 10 years) to line its pockets at the expense of its authors speaks to its bad faith.

McGraw Hill also argues that the implied covenant claim is duplicative of the breach of contract claim, but that is incorrect.  Plaintiffs' express breach of contract claim alleges that

McGraw Hill cannot pay authors royalties on something less than the net receipts from sales of Connect-platform textbooks and cannot pass publishing costs on to authors in the form of a "platform fee."  Plaintiffs' implied covenant claim, by contrast, alleges that *if* McGraw Hill is contractually permitted to allocate net receipts to different Connect components (it is not), it is breaching the implied covenant of good faith and fair dealing by doing so in a manner that systematically undervalues authors' works and destroys the fruits of the publishing agreements. The claims are distinct.

For these reasons, the Court should reject Defendants' motion to dismiss in its entirety.

## II.   FACTS

Plaintiffs in this class action are academic and textbook authors who have contracted with McGraw Hill to publish their works.  ¶¶ 13-17.  Under the contracts, Plaintiffs write textbooks, and McGraw Hill publishes and distributes them at its own expense.  Plaintiffs and McGraw Hill split the revenues associated with the sales of the works, with McGraw Hill keeping the lion's share of the revenue.  ¶ 48.  Authors' royalties are a negotiated percentage of the sale price of the works.  The royalty payments that Plaintiffs earn constitute an important part of their income, which in many instances would otherwise consist primarily of the salaries they receive as academics.  ¶ 49.

McGraw Hill is one of the largest educational publishing companies in the United States. ¶¶ 27-29.  The Company boasts partnerships with more than 14,000 authors and distributes content to approximately 250,000 higher-education students and 13,000 grade-school districts in more than 100 countries.  ¶¶ 27-28.  With a 24% market share, McGraw Hill is also the leading provider of new instructional materials in the approximately $3.4 billion U.S. higher-education learning solutions market.  ¶ 29.

The operative contractual provisions at issue in this action are substantively the same across Plaintiffs' Royalty Contracts with McGraw Hill.  ¶ 50.  The Royalty Contracts provide for: (1) a royalty rate, applied to (2) the amount of money McGraw Hill receives, from (3) the sale of each "work" regardless of the format or platform McGraw Hill chooses to use when selling the work. ¶ 50.  Specifically, the Royalty Contracts provide that McGraw Hill must publish the works at its own expense, and pay royalties as a percentage of "net receipts," which the contracts define as the "selling price" less certain items that do not include any publishing costs.  ¶ 71.  The agreements define "work" by reference to the title of the work. ¶¶ 56, 63; Declaration of Saul B. Shapiro ("Shapiro Decl."), ECF No. 36, Exhibit E, Preamble; Shapiro Decl., Exhibit F § 1; Shapiro Decl., Exhibit G, Preamble.

Thus, for example, Professor Flynn's Royalty Contract states that he "shall prepare and deliver" to McGraw Hill a manuscript for a "work" entitled "ECONOMICS: Principles, Problems, and Policies, 11th Edition."  ¶ 56.  McGraw Hill "shall publish the Work at its own expense" in "such style and manner . . . and sell the Work at such prices, as it shall deem suitable."  ¶ 57. Under Section 7 of Professor Flynn's Royalty Contract, McGraw Hill "shall pay" a royalty consisting of a "percentage of [McGraw Hill's] net receipts for each copy of the Work sold" by McGraw Hill in the United States.  ¶ 58.  "Net receipts" are defined as McGraw Hill's "selling price, less discounts, credits, and returns, or a reasonable reserve for returns."  ¶ 59.  Pursuant to a 2006 amendment, Professor Flynn's Royalty Contract also specifies that the "[r]oyalty for electronic rights to the work is the same as the domestic royalty rate" for sales in the United States. ¶ 61.

Similarly, Professor Karlan and Professor Morduch's Royalty Contract defines the "work" as "Principles of Economics" and the single-semester, split versions of their work: "Principles of

Microeconomics" and "Principles of Macroeconomics." ¶ 63.  The Royalty Contract further states that McGraw Hill "will publish the Work in book and/or electronic form at its own expense," and in publishing the work at its own expense, McGraw Hill makes "[a]ll decisions as to style of printing, paper and binding, . . . design and programming of electronic editions, . . . price(s) and all other matters involving terms of sale, distribution, advertising, promotion, appearance, design and format of the Work[.]" ¶ 64.  Royalties are due on the "net receipts from the sale of all print, custom and electronic editions" of the work. ¶ 65.  "Net receipts" are defined in turn as the "selling price from each copy of any edition or version of the Work" less any "discounts, rebates and amounts credited for returns, and less a reasonable reserve for future returns." ¶ 66.

As with Professor Karlan and Professor Morduch's Royalty Contract, Professor Myers and Professor Twenge's Royalty Contracts define their "works" as "Social Psychology," "Social Psychology, Fourteenth Edition," and "Social Psychology: The Core," a/k/a *Exploring Social Psychology*.  Shapiro Decl., ECF No. 36, Exhibit E Preamble; Shapiro Decl., ECF No. 36, Exhibit F § 1; Shapiro Decl., ECF No. 36, Exhibit G, Preamble; Shapiro Decl., ECF No. 36, Exhibit H. Professor Myers and Professor Twenge's Royalty Contracts state that McGraw Hill will pay a royalty on the "net receipts" from sales of the "Work." ¶¶ 68-69.  The Royalty Contracts define "net receipts" as McGraw Hill's "selling price less discounts, credits, and returns, or a reasonable reserve for returns." ¶ 69.  Moreover, McGraw Hill "shall publish the work at its own expense." ¶ 70.

For much of McGraw Hill's history, it published textbooks on a print platform with paper and ink.  ¶ 3.  In 2009, McGraw Hill launched Connect, an online platform and content-delivery system for hosting and delivering ebooks and related course materials.  ¶¶ 34, 37.  Each Connect offering consists of a textbook and course content derived from that text, sold together for a single

unitary price.  ¶ 38.  Course content on the Connect platform cannot be purchased exclusive of a textbook.  ¶ 38.  Thus, without textbooks, Connect would be an empty, functionally useless shell, similar to a print textbook filled with blank pages.  ¶ 41.  Aside from being the centerpiece of each Connect offering, the textbooks form the basis of the courses and Connect content built around them, and instructors launch Connect courses by searching for and selecting a textbook.  ¶¶ 40-42.

When McGraw Hill launched Connect in 2009 (and continuing until just a few months ago), it paid royalties on the entire "net receipts" for Connect, *i.e.*, the "selling price" of the Connect textbook, less certain items not at issue here ("discounts, credits, and returns, or a reasonable reserve for returns".  ¶¶ 46, 52, 71.  McGraw Hill regularly sent authors royalty statements explaining that royalties were being paid upon the "Received Price" (functionally synonymous with "net receipts") of the works, whether sold in hardcopy, loose leaf, eBook, Connect, inclusive access, access card, or rental format.  ¶¶ 51-52.

McGraw Hill's practice of paying royalties on the total net receipts from Connect sales continued for more than a decade.  Then, in November 2020, McGraw Hill's royalty policy dramatically changed, though its authors' contracts did not.  ¶ 74-75.  Under McGraw Hill's new royalty-calculation policy, the Company pays royalties (1) only on the *portion* of the sales price that it unilaterally determines is the "revenue attributed to the ebook component" of Connect textbook sales, and (2) a *reduced* royalty (a "permissions fee") on course content.  ¶¶ 76-77.  The Company determines how much of the sales price to attribute to the "ebook component" by taking the "stand-alone list price of the ebook of corresponding duration" and dividing it by the "list price of the Connect product."  ¶ 76.  Revenue attributed to course content is "any revenue not attributed proportionally to the ebook or platform components."  ¶ 76.

McGraw Hill gave authors a facially implausible explanation for the change.  ¶ 87.  It told authors that "it was only recently that McGraw Hill had an objective way of determining the relative value of the three components of the Connect product." *Id.*  That is, even though the Company had been selling Connect textbooks for more than a decade, McGraw Hill supposedly had no idea how to price an ebook or any of the other components of the full Connect textbook product. *Id.*

This method of paying royalties is a wholly new invention found nowhere in Plaintiffs' Royalty Contracts.  Those agreements require the payment of royalties on "net receipts" (*i.e.*, the "selling price less discounts, credits, and returns, or a reasonable reserve for returns") of sales, not "revenue attributed" to specific components of a sale.  ¶ 78. The new method also results in McGraw Hill passing its Connect-related publication costs to authors by reducing royalty-bearing revenues to account for those costs—assessing what is essentially a platform fee to authors.  ¶¶ 79-80.  Similarly, the new method is contrary to McGraw Hill's longstanding practice of paying royalties on the entire net receipts of Connect textbooks, which reflects its longstanding understanding of the bargain it has with authors.  ¶ 83.  Overall, McGraw Hill's unilateral amendment of the Royalty Contracts has caused an estimated 25% to 35% reduction in royalties paid to authors on the sales of their works. ¶ 11.

McGraw Hill's reduction in royalty payments constitutes a breach of the express terms of the Royalty Contracts, and a breach of the implied covenant of good faith and fair dealing.

## III.   ARGUMENT

### A.      The Legal Standard for a Motion to Dismiss

On a motion to dismiss under Rule 12(b)(6), a court must assume that all allegations in the complaint are true and draw all reasonable inferences in the plaintiff's favor.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 68 (2d Cir.

2014).  Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests."  *Harlequin*, 751 F.3d at 70.  Allegations need not be "detailed or elaborate," but merely "sufficient to raise an entitlement to relief above the speculative level."  *Id.*  A court may only grant a motion to dismiss if there are insufficient factual allegations, accepted as true, to state a claim for relief that is "plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"At the motion to dismiss stage, a court may only 'dismiss a complaint based on a contract if the contract unambiguously shows that the plaintiff is not entitled to the requested relief.'"  *Errant Gene Therapeutics, LLC v. Sloan-Kettering Inst. for Cancer Rsch.*, No. 15-CV-2044 (AJN), 2016 WL 205445, at *4 (S.D.N.Y. Jan. 15, 2016) (citation omitted).

### B.    McGraw Hill Breached the Express Terms of the Royalty Contracts

McGraw Hill's unilateral act of reducing royalty payments to authors of Connect textbooks violates the express terms of the Royalty Contracts.  To state a claim for breach of contract under New York law, "the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages."  *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015).  McGraw Hill only challenges the third element, but it has not carried its burden to show that that the contracts unambiguously foreclose Plaintiffs' claims.

#### 1.  *McGraw Hill Breached the Unambiguous Terms of the Royalty Contracts*

The Royalty Contracts by their terms provide that (1) McGraw Hill must calculate royalties on the "net receipts" (i.e., "selling price less discounts, credits, and returns, or a reasonable reserve for returns") that McGraw Hill uses when making a sale, ¶¶ 59, 66, 69, 71; and (2) McGraw Hill must publish the works "at its own expense," that is, it cannot pass on the cost of publication to

authors, ¶¶ 57, 64, 70-71.  McGraw Hill's new royalty methodology breaches both of these provisions.

    ***<u>Deductions from "Sales Price" of the "Work".</u>***  McGraw Hill's new royalty payment policy breaches its express obligation to pay royalties on "net receipts."  The new policy is a plain attempt to rewrite the Royalty Contracts by suggesting it need only pay royalties on "revenue attributed" to specific components of Connect sales.  But McGraw Hill does not sell Connect textbooks as separate components, nor does it charge students separate fees for the ebook and other components of a Connect textbook.  ***Rather, the Company sells Connect textbooks as a single item for a single unitary price.***  ¶¶ 38, 46.  As such, the "selling price" for "works" sold on Connect is that single unitary price.  The Royalty Contracts require McGraw Hill to pay royalties on "net receipts," defined as the "selling price" of the "Work" less items not at issue here ("discounts, credits, and returns, or a reasonable reserve for returns").  ¶¶ 58, 59, 65, 66, 68, 69.  Thus, McGraw Hill is contractually-obligated to pay royalties on the "net receipts" (*i.e.*, "selling price") of Connect versions of authors' works.

    To take the same example cited in McGraw Hill's brief, *see* Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Complaint ("MTD Brief"), ECF No. 35, at 8-9, McGraw Hill offers a Connect version of *Exploring Social Psychology*—the "Work"—for the unitary price of $90.[2]  That is the only Connect option available.  Under the agreement for *Exploring Social Psychology* (originally titled *Social Psychology: The Core*), McGraw Hill must pay royalties on its "net receipts for each copy of the Work sold," including Connect versions. Shapiro Decl., ECF No. 36, Exhibit G, § 7(a)(1) (Professor Myers's agreement); Shapiro Decl.,

---

[2]    *See*   https://www.mheducation.com/highered/product/exploring-social-psychology-myers-twenge/M9781260254112.html#interactiveCollapse.

ECF No. 36, Exhibit H (amendment adding Professor Twenge as an author). The Contract defines "net receipts" as the "selling prices less discounts, credits and returns, or a reasonable reserve for returns." Shapiro Decl., ECF No. 36, Exhibit G, § 7(c). There is only **one** selling price for the Connect version of *Exploring Social Psychology*: $90. McGraw Hill must therefore pay royalties on the full $90, which it concedes it has not done. *See* MTD Brief, at 8–9.

Instead, McGraw Hill is paying royalties on what it refers to as "revenue attributed to the ebook component." This language does not appear in the Royalty Contracts (nor anything like it). McGraw Hill's insertion of this term into its contractual relationship with the authors and its failure to pay authors royalties based on the full selling price of Connect versions of their works breaches the Royalty Contracts. *See In re World Trade Ctr. Disaster Site Litig.*, 754 F.3d 114, 122 (2d Cir. 2014) ("Courts should be 'extremely reluctant' to imply a term that 'the parties have neglected to specifically include." (citation omitted)).

McGraw Hill's focus on the contractual definition of the "work" is a red herring. *See* MTD Brief, at 14. The agreements define "work" by reference to the title of the work. ¶¶ 56, 63; Shapiro Decl., Exhibit E Preamble; Shapiro Decl., Exhibit F § 1; Shapiro Decl., Exhibit G, Preamble. The Contracts clearly state that McGraw Hill must pay royalties on the "net receipts" as derived from the "selling price" of the "work"—not some portion of the "selling price" as unilaterally determined by McGraw Hill—no matter the format, title, or delivery platform associated with the work. ¶¶ 50-52, 61, 64, 70. Accordingly, when McGraw Hill sells Plaintiffs' "works"—whether "ECONOMICS: Principles, Problems, and Policies, 11th Edition," "Principles of Economics," "Principles of Microeconomics," "Principles of Macroeconomics," "Social Psychology," "Social Psychology, Fourteenth Edition" or "Exploring Social Psychology"—on Connect, it must pay royalties from the single, unitary Connect selling price it charges for each such "work." To return

to the above example, the selling price of the Connect version of Professor Myers and Professor Twenge's "work"—*Exploring Social Psychology*—is $90.  McGraw Hill must pay royalties on that full price.

To support its incorrect interpretation of the Royalty Contracts, McGraw Hill heavily relies on a non-binding and distinguishable case: *Bernstein v. Cengage Learning, Inc.,* No. 19-cv-7541 (ALC), 2020 WL 5819862 (S.D.N.Y. Sept. 29, 2020).  In *Cengage*, the publishing company Cengage Learning, Inc. ("Cengage") allocated revenue from sales of "MindTap" versions of authors' works—digital versions of the works—to either the underlying textbook (on which it paid royalties) or other associated course content (on which it did not pay royalties).  *Id.* at 2.  The *Cengage* decision is distinguishable for three reasons.  First, the *Cengage* decision is irrelevant to Plaintiffs' allegations here that McGraw Hill is assessing an illegal platform fee and not publishing Connect works "at its own expense."  There was no platform fee at issue in *Cengage* and thus it does not support McGraw Hill's arguments that it can allocate revenue from Connect sales to the Connect platform itself and effectively charge a platform fee to authors.  Second, the Royalty Contracts here, unlike the agreements in Cengage, provide that McGraw Hill must pay royalties on the "net receipts" from electronic sales ***and*** that net receipts are calculated according to the "*selling price*" of the work—not some portion thereof.  McGraw Hill is breaching the contracts by not using the "selling price" to calculate royalties and instead reducing that selling price to account for its own supposed contributions to Connect.  Third, Cengage did not, as McGraw Hill did here, pay royalties on the entire net receipts from the sales of its electronic-platform works for a full *decade* before suddenly switching course.  Cengage's course of performance was therefore not at issue.  *Contra id.* at *4 (granting motion to dismiss, in part, because "Plaintiffs [have not] endeavored to plead anything besides the plain text of the clause in support of their

interpretation.").  McGraw Hill's reliance on *Cengage* is misplaced, as that decision is inapposite and non-precedential.

McGraw Hill's reference to the bundling provisions of certain contracts also does not change the analysis on the express breach claim.  *See* MTD Brief at 14-15.  McGraw Hill first points to statements in the Flynn and Myers contracts that say "[n]o royalty *or other payment* shall be due for . . . supplementary materials distributed with but not sold separately from the work."  Shapiro Decl., Exhibit C § 7(b) and Exhibit E § 7(b).  This merely indicates that no *additional* payment, above the royalty owed on "net receipts," would be paid for supplementary materials.  The author is entitled to receive the royalty on the entire "selling price"—but no more.  If anything, this provision supports the conclusion that royalties must continue to be paid on other content sold as part of one package on Connect.

Defendants next turn to Karlan and Morduch's contract which contemplates "sales of the Work as part of a bundle with other products," *i.e.* other works. ¶ 53.  Notably, in the twelve years that McGraw Hill has been selling authors' works on Connect, it has never invoked this provision to reduce the royalties it pays on sales of Connect textbooks.  *Id.*  This is because Connect textbooks constitute a single product sold for a single price, and are not "bundled" products.[3]

***Illegal Platform Fee.***   The new royalty payment policy also breaches the Royalty Contracts because, by allocating revenue to the Connect platform and reducing royalty payments accordingly, McGraw Hill charges each author what amounts to a "platform fee" on every Connect

---

[3] Looking again at the *Exploring Social Psychology* example cited in McGraw Hill's brief, the "bundle" options for that book allow students to purchase the Connect textbook as a bundle with either a physical textbook rental or a loose-leaf textbook purchase. https://www.mheducation.com/highered/product/exploring-social-psychology-myers-twenge/M9781260254112.html#interactiveCollapse (last accessed June 13, 2021).  As the website reflects, the Connect textbook by itself is not a "bundled" product.

sale to account for McGraw Hill's Connect-related costs.  Using such costs to reduce royalties is a clear violation of the Company's contractual promise and obligation to publish the works— whether in print or digital form—"at its own expense."  ¶¶ 57, 64, 70-71.  There is no dispute that, for print books, McGraw Hill could not deduct a "publication fee" to account for the costs to print and bind the works.  The same holds true for electronic versions.  McGraw Hill's "platform fee" is the internet-age equivalent of passing on the cost of ink, paper, and binding to authors, and that is enough to state a claim for breach of contract.

McGraw Hill's motion raises two responses to these allegations, neither of which hold water.  First, relying on facts outside the complaint, McGraw Hill argues that its "platform fee" does not pass publication costs onto authors because McGraw Hill sometimes sells access to the Connect platform separately from textbooks.  MTD Brief, ECF No. 35, at 16-17.  This is irrelevant for two reasons.   For starters, the premise—that the Company sells access to Connect independently of any textbooks—contradicts allegations in the Complaint (¶¶ 40-41, 82) and is based solely on a self-serving email from a McGraw Hill representative attached to its motion to dismiss.  The Court, however, cannot resolve this factual dispute on a motion to dismiss, which depends on evidence appearing nowhere in the Complaint, and certainly not in McGraw Hill's favor.  *See Weinstein Co. v. Smokewood Ent. Grp., LLC*, 664 F. 2d 332, 337 (S.D.N.Y. 2009) ("When deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in plaintiff's favor."); *Arden Way Assocs. v. Boesky*, 664 F. Supp. 855, 857 (S.D.N.Y. 1987) ("Fed. R. Civ. P. 12(b)(6) is not an appropriate vehicle by which to decide what fundamentally are factual disputes.").

In any event, whether Connect is sold separately is irrelevant to whether McGraw Hill's platform fee is, in fact, penalizing authors for the cost of publication and passing those costs on to authors. If tomorrow McGraw Hill entered the business of selling paper and ink separately from textbooks, it could not turn around and begin assessing a "paper and ink fee" on the sales of hardcopy textbooks and pass such costs on to authors. So too here. McGraw Hill may well monetize the Connect platform in other ways independent of Plaintiffs' textbooks, but that does not absolve the Company of its obligation to publish textbooks—even Connect textbooks—at *McGraw Hill*'s expense. McGraw Hill must bear the costs of providing textbooks to consumers in whatever format it chooses. ¶¶ 57, 64, 70-71, 79-82. For print works, that means bearing the costs of printing and binding the works. ¶¶ 9, 81. For digital works, as McGraw Hill concedes, that means bearing the costs of "making the text accessible, readable, and useable in a digital format," MTD Brief at 17, which is what the Connect platform accomplishes. ¶¶ 9, 37-39, 41.

At a minimum, there is a factual question of how Connect works and whether it is best considered a content-delivery-system, or something more, as highlighted by McGraw Hill's need to rely on excerpts from a self-serving email. Resolving this dispute in McGraw Hill's favor is inappropriate at the motion to dismiss stage.

Second, McGraw Hill argues that Connect versions of Plaintiffs' textbooks include add-on materials like "guides, presentations, and question and answer banks." MTD Brief at 17. This too is irrelevant to Plaintiffs' allegations about McGraw Hill's platform fee for the "design and creation costs" associated with creating the Connect platform itself. ¶¶ 80, 95(f), 105. McGraw Hill's new royalty methodology allocates revenues separately to the Connect platform and to other Connect content such as "guides, presentations, and question and answer banks." ¶ 76. It is the

decision to allocate revenue to the Connect platform and charge what is effectively a platform fee that violates McGraw Hill's obligation to publish works at its own expense.

On the contracts at issue here, and in light of all facts alleged, the Court should deny McGraw Hill's motion to dismiss the breach-of-contract claim.

### 2. McGraw Hill Cannot Show That the Plain Terms of the Royalty Contracts Unambiguously Support Its Interpretation

At a minimum, the Royalty Contracts do not *unambiguously* permit McGraw Hill's new practice of assessing platform fees and paying royalties on less than net receipts. That alone is fatal to its motion to dismiss because "a court may only dismiss a complaint based on a contract if the contract unambiguously shows that the plaintiff is not entitled to the requested relief." *Errant Gene Therapeutics*, 2016 WL 205445, at *4 (citation omitted).

A contract term is unambiguous only if it has "a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." *Staples*, 802 F.3d at 294–95. Stated differently, "[c]ontract language is ambiguous if it is reasonably susceptible of more than one interpretation." *Electra v. 59 Murray Enters., Inc.*, 987 F.3d 233, 245 (2d Cir. 2021) (citation omitted). Here, the Royalty Contracts unambiguously require McGraw Hill to pay royalties on the net receipts from sales of Connect versions of Plaintiffs' works. At worst, Plaintiffs' interpretation is reasonable, and the contracts are susceptible to more than one interpretation.[4] Thus, even if McGraw Hill could somehow show its interpretation of the Royalty

---

[4] Defendants assert that Plaintiffs have acknowledged that the Royalty Contracts are unambiguous. MTD at 18. But while Plaintiffs argue that the Royalty Contracts unambiguously require McGraw Hill to pay royalties on the entire net receipts from sale of the textbooks, if the Court determines that the contracts are ambiguous, Plaintiffs also argue that "McGraw Hill's decade-long course of performance demonstrates that McGraw Hill itself understands the contracts require payment of royalties on the entire selling price of the works." Tr. at 10:15-21; Letter to Hon. Schofield dated April 22, 2021 at 2.

Contracts were *a* reasonable interpretation of the agreements (it is not), it is lightyears away from showing, as it must on a motion to dismiss, that its interpretation is the *only* reasonable one.

Under New York law, "if contract terms are ambiguous, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Bank of New York Tr. Co. v. Franklin Advisers, Inc.*, 726 F.3d 269, 276 (2d Cir. 2013) (quotation omitted). The question of McGraw Hill's' intent based upon its course of conduct is a question of fact. *New Moon Shipping MAN B&W Diesel AG*, 121 F.3d 24, 31 (2d Cir. 1997). Critically, McGraw Hill's course of performance, "considered to be the most persuasive evidence of the agreed intention of the parties," disproves its interpretation of the Royalty Contracts. *See Starr Indem. & Liab. Co.*, 388 F. Supp. 3d at 329; *Gulf Ins. Co. v Transatlantic Reins. Co.*, 69 A.D.3d 71, 85-86 (N.Y. App. Div. 1st Dep't, 2004) ("[T]he parties' course of performance under the contract is considered to be the most persuasive evidence of the agreed intention of the parties." (quotation omitted)); *see also Old Colony Tr. Co. v. City of Omaha*, 230 U.S. 100, 118 (1913) ("Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.").

For more than *ten years*, McGraw Hill paid royalties on the net receipts from the *entire* Connect sales price, and reported these royalties to authors twice a year in written royalty statements. Under New York law, this longstanding practice equates to McGraw Hill "acknowledg[ing] its obligation to pay" authors on the entire Connect sales price. *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46-47 (N.Y. 1956); *see also New Moon Shipping*, 121 F.3d at 31 (a party's understanding of its contractual obligations "may be inferred from . . . tacit acceptance of a clause repeatedly sent" to the other party); *Ward v. Nat'l Geographic Soc'y*, 284 F. App'x

18

822, 823-824 (2d Cir. 2008) ("evidence that a party has ratified terms by failing to object" is relevant to their understanding of the contract's requirements).  The position that McGraw Hill advances in this litigation flatly contradicts its consistent conduct since Connect's launch.  *Auscape Int'l v. Nat'l Geographic Soc.*, 282 F. App'x 890, 891 (2d Cir. 2008) (finding party's "conclusory interpretation of the contracts was contradicted by the consistent course of dealings between the parties").  McGraw Hill is a business operating for profit, and it would be absurd to suggest that it has been generously "gifting" higher royalty payments to authors for more than ten years, and deciding this "gifting" defense in McGraw Hill's favor cannot be done on the pleadings.  It is certainly plausible that McGraw Hill's course of performance shows that it is obligated to pay royalties on the total net receipts from sales of Connect-versions of authors' works and it has breached the Royalty Contracts by failing to do so.

McGraw Hill devotes much of its course of performance argument to rebutting the notion that the parties modified their contract through their conduct.  MTD Brief at 18-19.  But, as a doctrinal matter, contract modification is distinct from course of performance, and here Plaintiffs have alleged that McGraw Hill's *course of performance* "reflects its longstanding bargain with its authors."  ¶ 83.  Similarly, its payment of royalties on the entire net receipts of Connect textbooks "reflect[s] its understanding that it is obligated to do so" under the Contracts.  *Id.*  Simply put, this is an issue of contract interpretation—not contract modification—and McGraw Hill's arguments regarding contract modification are irrelevant.  Tellingly, McGraw Hill offers no argument countering that its course of performance unequivocally demonstrates its understanding that it is obligated to pay royalties on sales of Connect works from total net receipts.

* * *

In sum, McGraw Hill has breached the express terms of the Royalty Contracts by (1) failing to pay royalties based on the total, unitary selling price of Connect versions of authors' works and (2) by charging what amounts to a platform fee to authors and thereby failing to publish Connect versions of their works at its own expense.  At minimum, the contracts are ambiguous, and McGraw Hill has not carried its burden to show that the agreements unambiguously permit its recent royalty-payment practices, particularly considering McGraw Hill's decade-long practice of paying authors royalties from the total net receipts received from sales of Connect works.

### C.   The Complaint States a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

#### 1.   *McGraw Hill Has Acted in Bad Faith by Devaluing the Works*

The Complaint also states an implied-covenant claim.  New York law implies in every contract a "a covenant of good faith and fair dealing . . . which encompasses any promises that a reasonable promisee would understand to be included."  *Spinelli*, 903 F.3d at 205; *see also 511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002); *Dalton*, 87 N.Y.2d at 389. Included in the implied covenant is that "neither party to a contract shall do anything [that] has the effect of destroying or injuring the right of the other party to receive the fruits of the contract," or to violate the other party's "presumed intentions or reasonable expectations."  *Spinelli*, 903 F.3d at 205 (citation omitted); *see also Jennifer Realty*, 98 N.Y.2d at 153; *Dalton*, 87 N.Y.2d at 389.

Here, McGraw Hill is destroying authors' rights to receive the fruits of their agreements by arbitrarily and unilaterally assigning "value" to Connect materials other than author textbooks and to the Connect platform in a way that undervalues authors' contributions to the platform and with the intent to reduce royalty payments and take more of the pie than it is owed.  ¶¶ 85, 113–14.  "Textbooks are the necessary component of the Connect Platform"; "without the textbook, the

other applications of the platform are useless." ¶ 41.  And yet, under McGraw Hill's new royalty initiative, it only attributes a fraction of the revenue it receives from Connect sales to authors' works.  Indeed, the new initiative is expected to reduce author royalties 25% to 35%.  ¶ 11. McGraw Hill's new royalty initiative thus systematically undervalues the author works that drive Connect sales and is nothing more than a bad-faith money grab.

Underscoring McGraw Hill's bad faith, McGraw Hill is abruptly changing course, after a decade paying authors royalties on net receipts from Connect sales, based on the flimsiest of rationales.  McGraw Hill argues that the Company only recently was able to "objectively" determine the relative values of the ebook, Connect platform, and course-material components of a Connect textbook sale. ¶ 87.  McGraw Hill would have authors believe that one of the largest, most sophisticated textbook companies paid tens of millions of dollars in excess royalties to authors for more than ten years simply because it had not conducted sufficient market research. *See* ¶¶ 33-34, 36, 87.  The absurdity of this justification speaks to McGraw Hill's bad faith. McGraw Hill has concocted an excuse to try to hide that its new royalty "methodology" is nothing more than an effort to enrich itself at the expense of authors. *See* ¶¶ 85–88, 113–14.  In any event, the truth or falsity of McGraw Hill's story is itself a factual question that cannot be resolved on this motion.

It also does not matter, contrary to what McGraw Hill emphasizes in its brief, that under this new initiative the artificial "price" of the ebook component of a Connect textbook sale is "determined proportionally based on the stand-alone list price of the ebook of corresponding duration to the Connect product divided by the list price of the Connect product."  ¶ 76; MTD Brief at 23.  McGraw Hill seems to be suggesting that the royalty reduction was done in good faith because McGraw Hill can measure it under a mathematical formula.  That argument misses the

point entirely, as it sidesteps the question of whether the arbitrary reduction—after a decade-long course of performance—itself constitutes a breach of the duty of good faith and fair dealing.  It also suggests that the value of an author's work when sold via Connect is only a fraction of the total value of the product, but that contradicts the plausible allegations in the complaint that authors' works drive Connect sales.  ¶ 41.  That factual question cannot be resolved on a motion to dismiss, and certainly not in McGraw Hill's favor.

Tellingly, the case McGraw Hill leans most heavily on—*Bernstein v. Cengage Learning, Inc.*, No. 19-cv-7541 (ALC), 2020 WL 5819862 (S.D.N.Y. Sept. 29, 2020)—undermines McGraw Hill's arguments here. There, Judge Carter held that Plaintiffs' allegations that Cengage acted "with the ulterior motive of appropriating what should go to the authors to itself" was sufficient to plead a claim for breach of the implied covenant of good faith and fair dealing.  *Id.* at *5. Plaintiffs' allegations here on this separate issue are substantively similar, and McGraw Hill's contention that such allegations are too conclusory is unavailing.

### 2.   The Implied Covenant Claim Is Distinct from the Breach of Contract Claim

Claims for breaches of the duty of good faith and fair dealing can be pled alongside ordinary claims for breach of contract under New York law provided they are not duplicative. *E.g.*, *Spinelli*, 903 F.3d at 205–06.  Plaintiffs' implied covenant claim is distinct from Plaintiffs' breach of contract claim, and they may thus be pled together.

Plaintiffs' breach of contract claim alleges that McGraw Hill violated the express terms of the Royalty Contracts by unilaterally adding new royalty clauses into the contracts and passing its Connect-development costs to authors.  The implied covenant claim, by contrast, alleges that McGraw Hill is enriching itself and depriving authors of their full royalty benefit by undervaluing the author works that drive Connect sales.  More specifically, Plaintiffs allege that McGraw Hill

has breached the express terms of the Royalty Contracts requiring it to publish works at its own expense and to pay royalties on total "net receipts" when it decided to attribute revenue to the Connect platform.  It has also breached the express terms of the Royalty Contracts requiring it to pay royalties on total net receipts by attributing revenue to what it has labeled course content. Plaintiffs' implied covenant claim, in contrast, alleges that McGraw Hill has breached the implied covenant of good faith and fair dealing by allocating revenues in a way that systematically undervalues authors' works in an effort to line its own pockets and without any reasonable justification—as evidenced by McGraw Hill's ludicrous explanation that it did not know what the price of an ebook is until more than ten years after launching Connect.  McGraw Hill's bad-faith motivations play no part in the breach of contract claims, which simply look at whether its conduct is consistent with the terms of the Royalty Contracts.

It does not matter that many of the underlying facts of the two claims overlap.  In *In re InSITE Services Corp., LLC*, 287 B.R. 79, 91-92 (Bankr. S.D.N.Y. 2002), for example, the plaintiff alleged, among other things, that the defendant breached a services agreement by terminating the agreement for cause even though no such cause existed.  Similarly, the plaintiff alleged that the defendant breached the duty of good faith and fair dealing by purporting to terminate the agreement for cause without a good-faith belief that the plaintiff was in breach.  *Id.* at 93.  Under those circumstances, the court recognized that "[a]lthough the conduct cited in the complaint to support the claim of bad faith is substantially the same conduct cited in the Plaintiff's breach of contract claims," there was a "critical distinction" between the claims that rendered the bad faith claim distinct from the breach of contract claims.  *Id.* at 94.  While the "focus" of the breach of contract claim was the "defendant's non-performance," the "essence of a claim for breach of the duty of good faith and fair dealing is not the defendant's acts *per se,* but the scienter behind those acts,"

and more specifically "whether the defendant demonstrated honesty in fact and observed reasonable commercial standards of fair dealing." *Id.* Since the plaintiff in that case was "not simply alleging non-performance" for its bad faith claim, but rather that the defendants "chose to pursue their own goals and to act in their own interest, contrary to the agreed upon purpose of the Agreement," the allegations were "different from the allegations of breach of contract," and the claim was sustained. *Id.* As explained above, the Plaintiffs here do not allege an express breach as part of their implied covenant claim—they allege that McGraw Hill is arbitrarily undervaluing the author works that drive Connect sales to reduce the amount it pays authors in royalties, in bad faith and without any reasonable justification. The claims are thus distinct.

Plaintiffs' claims for breach of the duty of good faith and fair dealing should also be sustained because "where, as here, there is a dispute over the meaning of the contract's express terms, there is no reason to bar a plaintiff from pursuing both types of claims [one for express breach and one for breach of the implied covenant] in the alternative." *Spinelli*, 903 F.3d at 206.[5] McGraw Hill dedicates the bulk of its argument to countering Plaintiffs' allegations on the Royalty Contracts' express terms and requirements, and in doing so McGraw Hill has put the dispute over those express terms into stark relief. For these reasons, the court should sustain Plaintiffs' claims for breach of the duty of good faith and fair dealing.

---

[5] In arguing that the implied covenant claims should be dismissed as duplicative, McGraw Hill relies heavily on *Gitman v. Pearson Education, Inc.*, No. 14 CIV. 8626 GBD, 2015 WL 5122564 (S.D.N.Y. Aug. 31, 2015), a case which is inapposite particularly in light of *Spinelli*'s subsequent authority. In *Gitman*, the defendant "d[id] not contest the sufficiency of Plaintiffs' allegation" that certain conduct, if proven, could constitute a breach of contract. *Id.* at 4. The court sustained the remainder of the plaintiffs' breach of contract claims because it saw "no reason to narrow or tailor Plaintiffs' theories of liability under this claim if the breach of contract claim survives on at least one allegation, especially at the pleading stage." *Id.* at 5. As such, any disputes over the meaning of the contracts' terms were entirely secondary to the court's decision to sustain those claims. *Id.* at 5. By contrast, McGraw Hill has sought to dismiss the entirety of the breach of contract claims here, and the meaning of the contracts' terms is a central feature of the parties' dispute.

## IV.    CONCLUSION

McGraw Hill's unilateral change to how it calculates royalties violates the express requirements of the Royalty Contracts and contradicts its understanding of its obligations under the contracts, as evidenced by its decade-long practice of paying royalties on the entire net receipts of Connect textbook sales. The Company's gamesmanship in reducing royalty payments by undervaluing author contributions to Connect products also constitutes a violation of the implied covenant of good faith and fair dealing.   For the foregoing reasons, the Court should reject Defendants' motion to dismiss.

Dated: June 15, 2021

**GRANT & EISENHOFER P.A.**

*/s/  Daniel L. Berger*
Daniel L. Berger (1656321)
Richard S. Schiffrin
Caitlin M. Moyna (4176897)
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Email: dberger@gelaw.com
          rschiffrin@gelaw.com
          cmoyna@gelaw.com

**SUSMAN GODFREY L.L.P.**

*/s/ Chanler A. Langham*
Chanler A. Langham
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Tel: 713-651-9366
Fax: 713-654-6666
clangham@susmangodfrey.com

Kalpana Srinivasan (*pro hac vice*)
Steven G. Sklaver (*pro hac vice*)
Rohit D. Nath (*pro hac vice*)
1900 Avenue of the Stars, Suite 1400

Los Angeles, CA 90067-6029
Tel: 310-789-3100
Fax: 310-789-3150
ssklaver@susmangodfrey.com
ksrinivasan@susmangodfrey.com
rnath@susmangodfrey.com

Tamar Lusztig
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Tel.: 212-336-8330
Fax: 212-336-8340
tlusztig@susmangodfrey.com

Alexander W. Aiken (*pro hac vice*)
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Tel.: (206) 516-3880
Fax: (206) 516-3883
aaiken@susmangodfrey.com

*Counsel for the Plaintiffs and Interim Co-Lead
Class Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2021, I caused the foregoing Memorandum of Law to be served via the Electronic Case Filing (ECF) system in the United States District Court for the Southern District of New York, on all parties registered for CM/ECF in the above-captioned matter.

*/s/ Chanler A. Langham*

Chanler A. Langham